607 So.2d 1119 (1992)
Wilson SMITH
v.
JACKSON CONSTRUCTION COMPANY and Fireman's Fund Insurance Company.
No. 90-CC-0145.
Supreme Court of Mississippi.
August 12, 1992.
*1121 Charlie Baglan, Charlie Baglan & Associates, Batesville, for appellant.
Lindsey C. Meador, Meador & Crump, Cleveland, for appellees.
En Banc.
SULLIVAN, Justice, for the court:
The Circuit Court of Coahoma County, Mississippi, reversed the Order of the Mississippi Workers' Compensation Commission (Commission) which had granted benefits to Wilson Smith and reinstated the order of the Administrative Judge, who had found that Smith suffered no disability as a result of an injury he received to the lateral portion of his right leg while performing the duties of his employment for the Jackson Construction Company on July 30, 1985.
Smith appeals to this Court and assigns three errors:
1. Whether substantial, credible evidence supported the Full Commission's finding that Claimant Smith's injury to his right leg July 30, 1985, resulted in ongoing medical problems.[1]
2. Whether the Full Commission erred in failing to find that Claimant Smith sustained a thirty percent permanent partial disability to his right lower extremity.
3. Whether the Full Commission erred by failing to grant penalties and interest to Claimant Smith.
Smith was 31 years old at the end of July, 1985, when a jackhammer fell and hit his leg. The evidence is contradictory as to whether this resulted in one or two wounds to his leg.
On July 31, 1985, Smith saw Dr. Stone in Batesville. Dr. Stone observed an infected penetrating wound an inch or two above Smith's right ankle, cleaned and bandaged it, and gave Smith antibiotics. Dr. Stone saw no need for Smith to take any time off work.
Smith saw Dr. Stone thirty to thirty-five times during the following three months for cleaning, redressing, and antibiotic treatment of the infected wound. During this period the wound had frequent drainage and some cellulitis had developed.
Smith believed he was not able to work because his leg was swollen and draining and he had difficulty getting his shoes on. He missed one or two days of work each week after his injury until September 10, 1985, when he was terminated.
On November 5, 1985, Dr. Stone noted that the ulcer had a "good scab and was healing." On November 19, Dr. Stone wrote that the ulcer had completely healed. Smith states that Dr. Stone did not even look at the wound on that visit. Although the wound continued to drain from November through December 1985, and Smith did *1122 not believe he was well, he did not seek additional medical treatment because he could not afford it. In January of 1986, Smith went to the health department for treatment, but the pediatrician on duty would not look at the wound.
Finally, on July 14, 1986, Smith saw Dr. Smoot. Dr. Smoot examined Smith and found that Smith had two wounds on his lower right leg, one healed and one not. The unhealed wound was a deep ulceration over the distal tibia or shin area with severe swelling up to mid-thigh and cellulitis for several inches around the scar.
Smith was hospitalized for five days and diagnosed as having a stasis ulceration and cellulitis as well as a probable blood clot or thrombosis in his right leg. A bone scan indicated that he could have developed osteomyelitis or an infection of the bone on his right tibia or shin bone.
On July 18, Smith was transferred to what is now the Baptist Memorial Medical Center in Oxford for treatment by Dr. Moore, an orthopedic surgeon. Moore observed two wounds on the lower right leg: an anterior wound that was draining over his right tibia and a lateral healed wound. Dr. Moore performed a surgical irrigation, debridement, and skin graft on the unhealed wound. The pathology report showed that Smith had chronic osteomyelitis, an infection of the bone. Smith remained at the hospital until August 11.
After August 11, Smith returned to the care of Dr. Smoot in Batesville. He continued to have problems with his right lower leg and on September 29, 1986, he was hospitalized through October 13 to treat the wound, which was now clearly infected.
In April, 1987, Smith was again hospitalized, this time with a complete obstruction to the deep venous system of his right leg, which was most likely secondary to thrombus formation.
In May, a venogram showed no obstruction, but did show some unusual filling of the superficial venous system within the calf. Smith's lab work also showed some abnormalities indicative of increased infection or an inflammatory process. Suspecting a reoccurrence of Smith's osteomyelitis, Dr. Smoot performed a bone scan and referred Smith back to Dr. Moore.
The last time that Dr. Smoot saw Smith before the deposition of July 14, 1987, was on July 3. At that time the medical treatment was ongoing, and Smoot said Smith would be on coumadin, a blood thinner medication, for at least six months. Dr. Smoot additionally believed that Smith could have a subsequent thrombosis or a reactivation of his osteomyelitis.
In the deposition Dr. Smoot testified that with respect to the venous problems in his right leg, Smith reached maximum medical recovery on July 3, 1987. Applying the 1984 American Medical Association Guides to the Evaluation of Permanent Impairment (2d ed. 1984), Dr. Smoot believed that the venous problem caused Smith a permanent medical impairment of 15 percent of the body as a whole or a 30 percent permanent partial impairment to his leg. Smoot not only believed that Smith was temporarily totally disabled from the time he first saw Smith until he reached maximum medical recovery, but that Smith was also probably temporarily totally disabled from the time of his injury until he saw Dr. Smoot. Dr. Smoot further testified that Smith's condition would cause him work limitations because standing in one position for five or ten minutes would be unhealthy and he would have to be able to sit down and elevate his leg if it began to hurt or swell.
Dr. Moore did not believe the osteomyelitis or Smith's venous problems would cause Smith any significant permanent impairment. But, Dr. Moore admitted that he had not treated Smith's venous problems and was not familiar with the AMA Guidelines for rating impairments of persons with venous problems.

I.

DID SUBSTANTIAL, CREDIBLE EVIDENCE SUPPORT THE FULL COMMISSION'S FINDING THAT CLAIMANT SMITH'S INJURY TO HIS RIGHT LEG JULY 30, 1985, RESULTED IN ONGOING MEDICAL PROBLEMS?
When Smith sought treatment from Smoot and Moore in July 1986, he undeniably *1123 had two wounds, a healed anterior wound a few inches above the ankle bone and an infected lateral wound of the right shin. The dispositive issue here is whether Smith received two wounds, as he claims, when he was injured on July 30, 1985. Dr. Stone, Smith's attending physician, says over the three months he treated Smith he only saw one wound, which was on the lateral or outer portion of the right leg. Dr. Stone denies that Smith had the wound which was later treated by Dr. Smoot. Smith, his brother, his sister, and a co-worker say there were two wounds.
Eddie Dogan, a previous employee at Jackson Construction, saw Smith after the accident with a bandage on his lower right leg. The bandage was bloody up on the shin bone and around the sides of Smith's leg in the general area where Smith now has a horseshoe-shaped scar.
Both Drs. Moore and Smoot observed two injuries on Smith's right lower leg. Neither could testify as to the cause of the wounds other than what Smith had told them: that he sustained two wounds when a jackhammer penetrated his leg. If Smith only had a healed lateral wound in November 1985, then Dr. Moore could give no opinion why he would have an anterior wound in July 1986.
Dr. Moore did state that though he thought it unlikely, Smith could have had a lateral wound when he was treated by Dr. Stone, and subsequent to the treatment developed the anterior wound because of a ceding effect from the lateral wound. Dr. Moore believed that the anterior wound would still have been evident sometime during the first two or three months. He then qualified his statement by saying, "Now I really want to stay away from probabilities in this. But in ... when a leg is traumatized, the most likely possibility is that this wound was substantially contributive [sic] to by an earlier trauma. But it's not something that I can say definitely and [make] substantially firm statements on."
When the Administrative Judge denied Smith compensation benefits, the basis for his decision was that Dr. Stone did not observe an open wound at any time during the course of three months of treatment and Dr. Moore testified by deposition that the second wound would have been apparent during Dr. Stone's treatment. Also, the Administrative Judge found it "beyond the realm of credibility that the claimant could have an infected draining wound on his right leg which went unattended from November 19, 1985, through July 14, 1986, a period of over 7 months."
The Full Commission reversed the Order of the Administrative Judge finding that Smith's ongoing medical problems were causally related to the jackhammer injury on July 30, 1985. It is worthy of note that the Commission found that Dr. Stone's testimony for three months of treatment to Smith consisted of "seven index cards with extremely brief notations handwritten by Dr. Stone" and that Dr. Stone had no written record at all to support the detail of his testimony or his recollection of the location of Smith's wound.
The Circuit Court then reversed the Full Commission's order stating that "... the Administrative Judge was in a better position to judge the credibility of the witnesses." The Circuit Court, noting that it could not reverse if substantial evidence supported the Commission's findings, stated the following:
However, in determining the "substantial evidence" question, it is recognized that evidence supporting the conclusion of the Full Commission may be viewed as less substantial when an impartial, Administrative Judge, who has observed the witnesses and lived with the case has drawn conclusions different from the Commission's; and, the findings of the Administrative Judge should be considered along with the inherent probability of the testimony to determine its substantiality and in a close case may even tip the scales in favor of a reversal of the Commission's contrary decision. See Dunn, Workmen's Compensation (3d ed. 1982) § 289 at p. 379.
The law in this State is that the Commission, not the administrative judge, is the ultimate fact-finder, and this Court will apply a general deferential standard of *1124 review to the Commission's findings and decisions despite the actions of the administrative judge. Walker Manufacturing Company v. Cantrell, 577 So.2d 1243, 1246 (Miss. 1991) (cites therein); see also, Hardin's Bakeries v. Dependent of Harrell, 566 So.2d 1261, 1264 (Miss. 1990) [citing Bracey v. Packard Elec. Div., Gen. Motors Co., 476 So.2d 28, 29 (Miss. 1985), and Dunn, Mississippi Workers' Compensation § 265 (3rd ed. 1982)].
Here we are reviewing the Circuit Court's reversal of the Commission's order, and when we do that we have recognized that the circuit court sits as an intermediate court of appeals. Walker Manufacturing, 577 So.2d at 1247 (cites therein); Hardin's Bakeries, 566 So.2d at 1264 (cite therein). Therefore, the circuit court is limited in its review and must defer to the findings of the Commission unless the Commission commits prejudicial error. Miss. Code Ann. § 71-3-51 (1972); [repealed & reenacted without change 1990];[2]Walker Manufacturing, 577 So.2d at 1247 (cites therein).
We will not determine where the preponderance lies when the evidence is conflicting. Metal Trims Industries, Inc. v. Stovall, 562 So.2d 1293, 1296-97 (Miss. 1990) (cites therein). Absent an error of law, where substantial credible evidence supports the Commission's decision, this Court, as well as the circuit court, may not interfere. Walker Manufacturing, 577 So.2d at 1247; Hardin's Bakeries, 566 So.2d at 1264 (cites therein); Dunn, Mississippi Workers' Compensation § 272 (3rd ed. 1982). But, where no evidence supports a decision, this Court will reverse. Metal Trims Industries, 562 So.2d at 1297.
The issue to be decided here is whether the Commission erred in finding that Smith's medical treatment which began approximately a year after Smith's initial injury was causally related to Smith's jackhammer injury sustained on July 30, 1985. Dr. Moore's testimony surmising how Smith could have presented Dr. Stone with one wound yet have presented two to Dr. Moore is irrelevant. Smith and his witnesses submit that he had two wounds during his treatment by Dr. Stone from July 31, 1985 through November 15, 1985. Dr. Stone says he had only one. Either Smith and his witnesses are mistaken or Dr. Stone is. Evidence supports the testimony of both.
Smith presented two family members and a co-worker who testified that they saw two wounds. Another co-worker saw a bandage with blood in the area where Smith's second wound is alleged to have been.
Dr. Stone testified that he only saw one wound. Dr. Stone's only records of the thirty-five visits made by Smith consisted of seven index cards and none of these cards described the injury or its location. Dr. Stone testified from memory on these issues and had to decipher the cards due to the illegibility of them. However, one index card revealed that Smith had been treated once by Dr. Stone's associate, Dr. Steward, in 1982 for a cellulitis of the right leg associated with multiple abrasions and punctures.
The Circuit Court's belief that the Administrative Judge was better suited to determine the credibility of a witness has been considered by this Court. We have found that even if the administrative judge is in a better position to assess the credibility of a witness, the legislature has declared the Commission the trier of facts:
There is considerable force to the argument that the... [Administrative Judge] is in a better position to decide disputed questions of fact because he hears the witnesses and observes their demeanor. On the other hand, the cumulative experience of the three commissioners representing diverse interests and their expertise in their particular field of endeavor *1125 may have been among the considerations that prompted the legislature to vest in the Commission full power and authority to decide all questions relating to the payment of claims for compensation.
Walker Manufacturing, 577 So.2d at 1246 [citing Malley v. Over the Top, Inc., 229 Miss. 347, 354, 90 So.2d 678, 680-81 (1956)]. Additionally, this Court has stated that "[t]he Workers' Compensation Commission is the trier and finder of facts in a compensation claim, the findings of the Administrative Judge to the contrary notwithstanding." Smith v. Container General Corp., 559 So.2d 1019, 1021 (Miss. 1990) [citing Dunn, Mississippi Workers' Compensation § 284 (3rd ed. 1982)].
In sum, we find the Circuit Court proceeded in a legally incorrect manner when it deferred to the findings of fact made by the Administrative Judge rather than to those of the Full Commission. Without going into the details, there is substantial evidence supporting the Full Commission's finding that all of Smith's leg problems arose from his untoward encounter with the jackhammer back in July of 1985. On the authority cited above and Metal Trims Industries, Inc., 562 So.2d at 1296-97, the Circuit Court should not have reversed the decision of the Commission. Under this Court's limited review, the Order of the Full Commission will be affirmed. The Circuit Court erred in its reversal of the Commission's decision, and we reverse the order of the Circuit Court and render on this issue.

II.

DID THE FULL COMMISSION ERR IN FINDING THAT CLAIMANT SMITH ONLY SUSTAINED A THIRTY PERCENT PERMANENT PARTIAL DISABILITY TO HIS RIGHT LOWER EXTREMITY?
The Commission found that Smith sustained at least a thirty percent permanent partial disability to his right lower leg, and awarded him compensation benefits for 52.5 weeks, or thirty percent of the 175 weeks allotted the leg by Section 71-3-17(c)(2). Smith contends that the evidence showed an industrial loss greatly in excess of this amount.
The evidence of Smith's physical disability comes from Dr. Smoot's testimony, following the AMA guidelines, that Smith sustained a permanent partial medical impairment of 15 percent of his body as a whole or a 30 percent permanent partial impairment to his leg as a result of his vascular problems. Smoot further noted that Smith would be permanently limited in his work. The record reflects that since Smith was discharged from Jackson Construction he has diligently tried to find work but has not been successful.
Dr. Moore, on the other hand, believed that Smith's impairment from the osteomyelitis would be minimal and, although he did not treat Smith for a postphlebotic syndrome, he also believed Smith would be only minimally impaired from that syndrome.
If there is substantial evidence to support the Commission, absent an error of law, this Court must affirm. On the other hand, where the Commission has misapprehended the controlling legal principles, we will reverse, for our review in that event is de novo.
Reviewing the record, the Commission clearly awarded Smith compensation based on his degree of medical or functional disability. Generally, predicating an award on medical or functional disability rather than upon a determination of the extent of loss of industrial use or impairment of claimant's wage earning capacity is error. Piggly Wiggly v. Houston, 464 So.2d 510, 512 (Miss. 1985) (cites therein); Compere's Nursing Home v. Biddy, 243 So.2d 412, 413 (Miss. 1971) (cite therein). The Compensation Act concerns occupational or industrial disabilities, not medical or functional disabilities. See, Miss. Code Ann., § 71-3-3(j) Supp. 1991); Delta CMI v. Speck, 586 So.2d 768, 773-74 (Miss. 1991); Stuart's, Inc. v. Brown, 543 So.2d 649, 653-54 (Miss. 1989). However, this has not been the case for the loss of a scheduled member that yields only a permanent partial occupational disability. See Miss.Code *1126 Ann. § 71-3-17(c) (Supp. 1991). Where the injury has not rendered the employee permanently totally occupationally disabled, the Act arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant's functional loss and without regard to loss of wage earning capacity. Walker Manufacturing, 577 So.2d at 1247-48; Dunn, Mississippi Workers' Compensation § 86, p. 101 (3rd ed. 1982); see also Miss. Code Ann. § 71-3-17(c) (Supp. 1991).
When a claimant has sustained a partial loss or loss of use of a scheduled member, the Workers' Compensation Act provides that "[c]ompensation for permanent partial loss or loss of use of a member may be for proportionate loss or loss of use of a member." Miss. Code Ann. § 71-3-17(c)(23) (Supp. 1991) (Emphasis ours). This Court in the past has read this to mean that "[t]he correct formula for determination of the rate and amount of compensation is: 66 2/3 of the average weekly wage, subject to the maximum rate, for a number of weeks equal to the percentage of loss times the scheduled number of weeks allowable for total loss of a member." Dunn, Mississippi Workers' Compensation § 84, p. 99-100 (3rd ed. 1982) (Emphasis added). Stuart Manufacturing Co. v. Walker, 313 So.2d 574, 575 (Miss. 1975); Luker v. Greenville Sheet Metal Works, 240 Miss. 378, 381-82, 127 So.2d 863, 864 (1961); Nowlin v. Mississippi Chemical Co., 219 Miss. 873, 880-81, 70 So.2d 49, 50 (1954).
However, in some cases, despite a partial functional loss of a scheduled member, the claimant's industrial or occupational disability or loss of wage earning capacity controls his degree of disability. See e.g. Richey v. City of Tupelo, 361 So.2d 995, 997-98 (Miss. 1978) (50% permanent functional loss of right arm, but 100% permanent industrial impairment); M.T. Reed Construction Co. v. Martin, 215 Miss. 472, 474-78, 61 So.2d 300 (1952) (10% permanent medical disability to lower right leg, but 100% industrial disability). In M.T. Reed, a claimant sustained a ten-percent permanent functional disability to his leg, according to the testimony of his treating physician. M.T. Reed, 215 Miss. at 474, 61 So.2d at 301-02. Despite this ten-percent medical impairment, the claimant showed that he suffered a greater occupational disability because he could no longer perform the substantial acts required of him as a carpenter and because of his age and physical condition it was unlikely he would be able to pursue any other gainful employment, in other words, that he was permanently, totally, occupationally disabled. Id., 215 Miss. at 477, 61 So.2d at 302. This Court held that despite being totally and permanently occupationally disabled, the claimant was not entitled to compensation for 450 weeks under Section 71-3-17(a), Permanent total disability," but only for 175 weeks, the maximum period allowed for compensation for loss of the use of a leg, according to the Schedule in Section 71-3-17(c), a subsection entitled "Permanent partial disability." Id., 215 Miss. at 478, 61 So.2d at 303; see also Richey v. City of Tupelo, 361 So.2d at 997-98 (despite being totally occupationally incapacitated, claimant entitled to permanent partial compensation benefits for 200 weeks, the maximum period allowed for compensation for loss of use of an arm). We find this view uncritically accepted in Dunn, Mississippi Workers' Compensation, § 89 (3rd ed. 1982).
Following M.T. Reed, the number of weeks of compensation for the total loss of or loss of use of the scheduled member still relates to the loss of the scheduled member, meaning the maximum number of weeks of compensation is limited by the maximum number of weeks allowed by statute for the loss of that scheduled member. Miss. Code Ann. § 71-3-17(c) (Supp. 1991). However, in Lucedale Veneer Co. v. Keel, 223 Miss. 821, 79 So.2d 233 (1955), a claimant sustained a sixty to sixty-five percent loss of use of one arm. Lucedale Veneer, 223 Miss. at 824, 79 So.2d at 234. This Court found that the claimant, upon showing that he was totally unable to do the work required of him in his usual occupation or employment, was properly awarded permanent partial benefits for 200 weeks, the maximum period allowed for compensation for loss of use of an arm, by the Commission. Id., 223 Miss. at 825-28, *1127 79 So.2d at 235-36. However, the Court's language in Lucedale that "[w]e are unable to say that [the lower court's] decision [to award compensation for permanent loss of use of an arm instead of compensation for permanent total disability] is manifestly wrong or is contrary to the overwhelming weight of the evidence" suggests that the Commission would not have erred by awarding compensation pursuant to Miss. Code Ann. § 71-3-17(a), the permanent total disability statute. Id., 223 Miss. at 828, 79 So.2d at 236.
Recently in Walker Manufacturing Co. v. Cantrell, 577 So.2d 1243 (Miss. 1991), this Court recited by rote the M.T. Reed rule that the statutory schedule caps the number of weeks for which compensation is payable, though the injury to the scheduled member in practice leaves the worker permanently totally occupationally disabled. Walker Manufacturing, 577 So.2d at 1248. What Walker Manufacturing holds in the end is that the M.T. Reed reading of the scheduled member statute applies in those cases where it would result in a greater benefit to the claimant, i.e., where the claimant had suffered no loss of wage-earning capacity but had suffered a permanent partial (medical or functional) disability of a scheduled member. That view proceeded on the traditional view that the "schedule" was exclusive and provided for compensation, even when no compensation would otherwise be payable. In other words, Walker Manufacturing is the converse of today's case.
Today's problem has arisen in other jurisdictions under similar compensation acts. Many states once followed the M.T. Reed approach, known as the exclusiveness rule:
But in recent years there has developed such a strong trend in the opposite direction that one might now, with equal justification, say that the field is dominated by the view that schedule allowances should not be deemed exclusive, ... [where] the issue is .. . treatment of any scheduled loss as a partial or total disability of the body as a whole.
2 Larson's Workmen's Compensation Law § 58.23 (1990).
Prof. John R. Bradley has offered insightful critique of M.T. Reed. Among other things, he has suggested the M.T. Reed Court
simply failed to note the subtleties of the statute's design. The obviousness of the limits of the schedule overwhelmed the less obvious distinction that the schedule's reference to "partial disability" did not displace the application of the "total disability" provision. Indeed, Section 71-3-17(a) says that "total disability shall be determined in accordance with the facts."[3]
And, he might have added, not in accordance with the schedule.
The Longshoremen's and Harbor Workers' Compensation Act has language identical to that in our act. 33 U.S.C. § 908(a) and (c). Under that act the schedule does not preclude a larger award for total disability if in fact the disability is total. Jacksonville Shipyards, Inc. v. Dugger, 587 F.2d 197 (5th Cir.1979). For a sampling of state court decisions rejecting the M.T. Reed approach and the exclusiveness rule, see, Smith v. Capps, 414 So.2d 102 (Ala. Civ. App. 1982); McNeely v. Clem Mill & Gin Co., 241 Ark. 498, 409 S.W.2d 502 (1966); Henderson v. Sol Walker & Co., 138 So.2d 323 (Fla. 1962); Hawes v. Westvaco Corp., 588 S.W.2d 716 (Ky.App. 1979).
Against this backdrop we think it appropriate that we should reconsider the M.T. Reed rule. It would seem that if a claimant is permanently and totally occupationally disabled, he should be entitled to compensation for a permanent total occupational disability, not a permanent partial disability. Compare Miss. Code Ann. § 71-3-17(a) with § 71-3-17(c) (Supp. 1991). To say that a person with a loss or loss of use of a scheduled member has but a permanent partial disability fails to take account of loss of wage earning capacity. If in *1128 light of that loss the claimant is actually rendered permanently and totally disabled, then there is no reason to disallow him permanent total disability compensation as provided by Section 71-3-17(a). Coverage under Section 71-3-17(c), including its familiar schedule, proceeds on the faith that the worker will be able to resume the same or other employment after he adapts to his disability. If after this period of adjustment the worker remains permanently and totally occupationally disabled, he by definition does not have a permanent partial disability and so the schedule found in Section 71-3-17(c) cannot control. Such a person should of right receive permanent and total disability compensation. Any other result is a travesty of justice which denies an employee injured in the course of his employment the compensation he is lawfully entitled to receive.
For these reasons we hold foursquare that Section 71-3-17(a) covers all cases of permanent total occupational disability, to the exclusion of Section 71-3-17(c) which by its title and its terms covers only permanent partial occupational disability (although it may be permanent, total loss of use of a specific member). Where an employee suffers an injury covered by the schedule in Section 71-3-17(c) and where that injury results in a permanent loss of wage earning capacity within Section 71-3-17(a), the latter section controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in Section 71-3-17(c)'s schedule. To this limited extent M.T. Reed stands overruled. Only insofar as they may be found inconsistent with today's holding, Walker Manufacturing, Richey, Lucedale Veneer, Luker, Nowlin, and Modern Laundry, Inc. v. Williams, 224 Miss. 174, 79 So.2d 829 (1955), stand modified.
If Smith's functional or medical disability were greater than thirty percent, the Commission erred in awarding Smith only thirty percent of 175 weeks. If Smith's occupational loss or loss of wage earning capacity was greater than thirty percent, then Section 71-3-17(c) makes clear the Commission should have awarded Smith that percentage of his industrial occupational disability, limited by the number of weeks he is entitled to receive compensation for the loss of use of a scheduled member. But, if Smith's industrial or occupational disability is both permanent and total, the case falls under Section 71-3-17(a) and the schedule becomes irrelevant. The evidence showed that Smith unsuccessfully sought employment, he had an eighth grade education, was learning disabled, had no job skills other than performing manual labor, and was severely limited in performing manual labor due to his injury. Allowing compensation for a permanent partial loss of a scheduled member takes no account of a claimant's loss of wage earning capacity. If a claimant is unable to earn wages despite only a loss or loss of use of a scheduled member, then the claimant is permanently and totally disabled. Compensation for a permanent partial disability for loss or loss of use of a scheduled member should only be applicable when a claimant has not sustained a permanent and total occupational disability. The Commission should have found that Smith sustained more than a thirty percent disability. The determination of the degree of industrial disability, however, is a finding of fact and must be reversed and remanded to the Commission for a determination on this question.
If on remand the Commission finds that Smith sustained a total loss of wage earning capacity, then Smith should be entitled to compensation pursuant to Miss. Code Ann. § 71-3-17(a).
This assignment of error has merit and for the reasons above stated, this portion of the case is reversed and remanded to the Commission for further findings.

III.

DID THE FULL COMMISSION ERR BY FAILING TO GRANT PENALTIES AND INTEREST TO CLAIMANT SMITH?

a. Penalty
When compensation payable without an award is not paid within fourteen days after notice of the injury, ten percent *1129 of such installment is provided by statute as a penalty. Miss. Code Ann. § 71-3-37(5) (Supp. 1991); Wilson v. Service Broadcasters, Inc., 483 So.2d 1339, 1344 (Miss. 1986). This penalty is mandatory unless (1) the employer controverts the right to compensation within fourteen days after he has knowledge of the injury, or (2) nonpayment is excused by the Commission after a showing that the installment could not be paid within the period prescribed for the payment because of conditions over which the employer had no control. Miss. Code Ann. §§ 71-3-37(4), -37(5) (Supp. 1991); Wilson, 483 So.2d at 1344; Dunn, Mississippi Workers' Compensation § 299, p. 393 (3rd ed. 1982). The fact that the employer may have disputed liability in good faith does not excuse nonpayment of an installment. Wilson, 483 So.2d at 1344 (cites therein); Dunn, § 299, p. 393.
Jackson Construction and Fireman's Fund do not contend that they filed notice of their intention to controvert within fourteen days of their knowledge of Smith's injury. Thus, unless the other exception to the mandatory penalty applies, the Commission should have imposed a penalty upon the award to Smith of temporary and permanent compensation.
Although Smith did not ask for compensation, that is not his burden. By statute the employer is required to pay compensation fourteen days after he has notice of the injury. Miss. Code Ann. § 71-3-37(2) (Supp. 1991). In this case Smith began missing approximately two days of work each week after his injury until he was terminated in September 1985. For this reason, Jackson Construction could have voluntarily paid compensation to Smith when it became due or it could have filed with the Commission a notice that it intended to controvert any amounts which could be due. Jackson Construction and Fireman's Fund made no showing that the installment could not have been paid within the period prescribed for the payment because of conditions over which the employer had no control. Thus, Jackson Construction and Fireman's Fund assumed the risk of error despite the fact that they had no knowledge of Smith's status after he was terminated. See generally Dunn, Mississippi Workers' Compensation § 299, p. 394 (3rd ed. 1982). This assignment of error has merit and claimant is entitled to the mandatory award of the penalty.

b. Interest
"Interest at the legal rate is allowed on all past due compensation payments from the due dates thereof." South Cent. Bell Telephone Co. v. Aden, 474 So.2d 584, 598 (Miss. 1985); see also, M & J Oil Co. v. Dependents of Wilson, 507 So.2d 1292, 1293 (Miss. 1987) (citing South Central Bell, supra); Dunn Mississippi Workers' Compensation § 293, pp. 383 & 386 (3rd ed. 1982). However, the most recent statute regarding interest on judgments and decrees provides:
All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.
Miss. Code Ann. § 75-17-7 (Supp. 1991). Following this statute, Smith is entitled to interest only from the date his action was first instituted, which would be July 29, 1986, the date Smith filed his petition to controvert. The Commission is instructed to so order as to the penalty and interest when it completes its remand.
REVERSED AND RENDERED IN PART; REMANDED IN PART TO THE COMMISSION FOR FURTHER FINDINGS OF FACT.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, PITTMAN, BANKS and McRAE, JJ., concur.
ROBERTSON, J., concurs with separate written opinion joined by PRATHER, SULLIVAN, BANKS and McRAE, JJ.
HAWKINS, P.J., dissents with separate written opinion joined by DAN M. LEE, P.J.
ROBERTSON, Justice, concurring:
I find compelling the Court's conclusion that, in the case of a scheduled member *1130 injury which has the effect of causing a permanent loss of wage-earning capacity, the number of weeks of compensation shall be the overall 450 week limit [Section 8(a) of the Act, codified as Miss. Code Ann. § 71-3-17(a) (1972)]. On reflection, I cannot fathom what would lead anyone reading the statute to think otherwise, that such an injured worker would have his compensation temporally limited by the "schedule" [Section 8(c) of the Act, codified as Miss. Code Ann. § 71-3-17(c) (1972)]. Section 8(a) concerns permanent total occupational disabilities and controls notwithstanding the fortuity that the worker's on-the-job injury is a scheduled member, here a leg. Section 8(c) is about permanent partial occupational disabilities and by definition has nothing to say of those permanently totally occupationally disabled.
I write separately because of a jurisprudential problem emanating from the 1990 re-enactment of the Mississippi Workers Compensation Act. Miss. Laws, ch. 405 (1990) (formerly House Bill No. 435). The problem arises in the context of our heretofore unbroken line of cases, beginning with M.T. Reed Construction Co. v. Martin, 215 Miss. 472, 474-78, 61 So.2d 300 (1952), down through and including Walker Manufacturing Co. v. Cantrell, 577 So.2d 1243, 1247-48 (Miss. 1991), holding (or saying) that, in the case of scheduled member injuries, the "schedule" controls and that compensation is determined by reference to Section 8(c) of the Act and not Section 8(a), notwithstanding the injury leads to a permanent total loss of wage-earning capacity.[1]See Richey v. City of Tupelo, 361 So.2d 995, 996-98 (Miss. 1978); Lucedale Veneer Co. v. Keel, 223 Miss. 821, 79 So.2d 233 (1955); Modern Laundry, Inc. v. Williams, 224 Miss. 174, 79 So.2d 829 (1955); Nowlin v. Mississippi Chemical Co., 219 Miss. 873, 880-81, 70 So.2d 49, 50 (1954); see also, Luker v. Greenville Sheet Metal Works, 240 Miss. 378, 127 So.2d 863 (1961). See also, Dunn, Mississippi Workers' Compensation § 89 (3d Ed. 1982); 2 Larson, The Law of Workmen's Compensation ¶ 58.22 (1989).
Tradition has it we must take account of the 1990 legislative re-enactment. Miss. Laws, ch. 405, § 9 (1990), re-enacts a statute construed in a certain way in 1952 in M.T. Reed and followed consistently since that time. This brings us face to face with a said-to-be-rule of statutory construction that we have very little wiggle room where the Legislature has re-enacted a statute whose judicial construction is settled. See, e.g., Hooker v. Gully, 182 Miss. 36, 43 180 So. 65, 66 (1938); Cutrer v. State, 207 Miss. 806, 813, 43 So.2d 385, 387 (1949); In re Kelly's Estate, 193 So.2d 575, 578 (Miss. 1967); Barr v. Delta & Pine Land Co., 199 So.2d 269, 271 (Miss. 1967). The rule is a crutch grounded in quicksand, a canard, pressed by the unwitting.[2]
The Supreme Court of the United States has had its own illicit romance with this rule. Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 266-67, 99 S.Ct. 2753, 2759-60, 61 L.Ed.2d 521, 531 (1979), though with important moments of doubt.
In Girouard v. United States, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), the Court expressed great and appropriate skepticism of the re-enactment rule. Construing the Nationality Act of 1940 which re-enacted prior law in its pre-existing form, the Girouard Court stated:
It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law. We do not think under the circumstances of this legislative *1131 history that we can properly place on the shoulders of the Congress the burden of the Court's error.
328 U.S. at 69-70, 66 S.Ct. at 830, 90 L.Ed. at 1090.
More appropriate here, Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), addressed a discrete exception within the re-enactment rule:
As we recently noted in Massachusetts Trustees v. United States, 377 U.S. 235, 241, 242, 84 S.Ct. 1236 [1242], 12 L.Ed.2d 268, 273 (1964), congressional re-enactment of a statute, even without any apparent knowledge of a particular regulation, can "strengthen to some extent" the regulation's claim to validity, but re-enactment cannot save a regulation which "contradicts the requirements" of the statute itself. When a regulation conflicts with the statute, the fact of subsequent re-enactment "is immaterial, for Congress could not add to or expand [the] statute by impliedly approving the regulation." Commissioner v. Acker, 361 U.S. 87, 93, 80 S.Ct. 144 [148], 4 L.Ed.2d 127, 131 (1959).
Leary, 395 U.S. at 24-25, 89 S.Ct. at 1542, 23 L.Ed.2d at 75. The administrative regulation exception makes even more sense in the judicial interpretation context, for we have greater leeway to fix our own founderings.
The re-enactment rule is flawed in its premises. It takes little regard of the pragmatic realities of its underlying phenomena, the legislative process with all its vagaries. The rule promotes dubious statutory construction, and today's case excellently illustrates the point. When the 1990 legislators voted upon Section 8's text, they had before them that text alone. That text by its terms provided compensation for permanent total loss of wage-earning capacity in subsection (a). It provided for permanent partial disability compensation in subsection (c) and included there a schedule for certain specific injuries. Nothing in the language as it appears would lead a reasonably intelligent person, familiar with the English language, to think subsection (c) had anything to say regarding persons suffering a permanent total loss of wage-earning capacity, and this is so even though that loss may emanate from an on-the-job injury to a scheduled member. Yet the canon would encrust M.T. Reed and progeny on to that act though its words will not bear it. Leary addressed this problem with the re-enactment rule and explained why, in cases like today's, even the rule's most devoted devotee's decline to follow it.
I do not question that the 1990 re-enactment is a political event of consequence. I do not rule out that there may be cases where substantial objective evidence shows a general community and legislative understanding that a prior judicial rendering has become a part of an act re-enacted. But reenactment without more is not enough. The force of law belongs only to that which has met the criteria for legal validity. Here that criteria in the end was the 1990 passage of House Bill No. 435 in the Senate and the House of Representatives and approval by the Governor. I find nothing in that bill that reads like M.T. Reed or the rule it has spawned. No legislator voted for M.T. Reed or for Vardaman Dunn's rendering of the rule. The Governor did not sign off on these.
The bottom line is that no legislator voted for M.T. Reed, in 1947 or in 1990. We put M.T. Reed into the act. Now that our error is seen, it is our job to take it out.
PRATHER, SULLIVAN, BANKS and McRAE, JJ., join this opinion.
HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
I have always felt that Miss. Code Ann. § 71-3-17(c), MWCA, Sec. 8(c), could in certain cases produce a harsh result, but I never entertained the slightest doubt of the accuracy of this Court's interpretation of the statute in M.T. Reed Construction Co. v. Martin, 215 Miss. 472, 61 So.2d 300, 303 (1952). Nor has the eminent author Dunn, Mississippi Workers' Compensation, § 89.
The perfect place to ameliorate the harshness of the statute is across the street. Those fellows are the ones to do it.
*1132 Unless predictable, "law" emanating from the Mississippi Supreme Court is only a metaphor, and an inapt one at that.
The majority overrules a well-reasoned decision which unquestionably interpreted a statute precisely as it is written. Today's decision hardly augurs well for confidence in our decisions.
Not only that, the majority by simply "ignoring" it, emasculates a fixed and firmly embedded principle that "[w]hen a statute is repeatedly re-enacted in essentially the same language and by its retention in all subsequent codes, a decision of this Court interpreting the statute becomes in effect a part of the statute." Crosby v. Alton Ochsner Medical Foundation, 276 So.2d 661, 670 (Miss. 1973). See also, McDaniel v. Beane, 515 So.2d 949, 951 (Miss. 1987); In re Kelly's Estate, 193 So.2d 575 (Miss. 1967); Kittrell v. O'Flynn, 203 Miss. 164, 33 So.2d 628 (1948).
In accord with familiar rules of construction, the legislature by reenactment of a statute which has been construed by the highest court of a state, adopts the construction placed upon the statute by the court. White v. Williams, 159 Miss. 732, 132 So. 573, 76 A.L.R. 757 (1931).
Garrett v. Mississippi State Highway Commission, 227 So.2d 856, 857 (Miss. 1969). This general rule of construction prevails in other states and the federal courts. See: Slatin v. Stanford Research Institute, 590 F.2d 1292, 1293 (4th Cir.1979); Richerson v. Jones, 551 F.2d 918, 927 (3rd Cir.1977); Cagle v. Butcher, 118 Ariz. 122, 575 P.2d 321, 323 (1978); Davies v. Bossert, 449 So.2d 418, 420 (Fla.App. 3 Dist. 1984); Smith v. Employers' Fire Ins. Co., 255 Ga. 596, 340 S.E.2d 606, 608 (1986); City of Portage v. Rogness, 450 N.E.2d 533, 535 (Ind. App. 3 Dist. 1983); Stawikowski v. Collins Elec. Const. Co., 289 N.W.2d 390, 395 (Minn. 1979); Texas Employers' Ins. Ass'n v. Perez, 673 S.W.2d 669, 672 (Tex. App. 1 Dist. 1984).
This is a common sense rule, because if a court construes a statute glaringly at odds with what the people speaking through the Legislature intended, it stands to reason the statute will be subsequently amended to reflect the actual intent of the Legislature.
Having thus interpreted the statute, and it having become a part thereof by repeated reenactment, this Court has no authority to change it, for to do is not simply overruling prior cases, but amending the statute.[1]
Because the majority amends the statute, the prerogative of the Legislature, I respectfully dissent.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] This issue will be dispositive of most of the other issues raised by Claimant Smith.
[2] Miss. Code Ann. § 71-3-113 (1972) originally provided that the Mississippi Workers Compensation Act "shall stand repealed as of December 31, 1990." Prior to that date the legislature repealed Section 71-3-113 and re-enacted the rest of the Act. Miss. Laws Ch. 405 (1990). All sections cited or discussed in this opinion originally governed here in their pre-1991 form but have been re-enacted without change.
[3] Bradley, "Scheduled Member Injuries" p. 18, published in Mississippi College School of Law's Workers' Compensation Practice & Procedure Seminar, Jackson, Mississippi, November 1, 1991.
[1] The traditional expression appears in this state's authoritative text:

With certain statutory exceptions, the award for the loss of scheduled members is limited to a specified number of weeks in each instance, but the loss or loss of use of a single member may result in the actual loss of wage-earning capacity and to thereby produce a total permanent disability from the industrial standpoint. Nevertheless, the employee is limited to the number of weeks specified in the schedules for loss of the particular member.
Dunn, Mississippi Workers' Compensation § 89, p. 107 (3d Ed. 1982).
[2] For a convincing critique of "re-enactment" and related rules, see Eskridge, Interpreting Legislative Inaction, 87 Mich.L.Rev. 67 (1988).
[1] The concurring opinion finds fault with this principle. If so, we should also overrule our cases pronouncing it. In the present posture of this case, we have a majority opinion which simply ignores its existence and a concurring opinion which, while at least not ignoring it, apparently would apply it when we chose to do so, and not apply it when we do not so choose; i.e., make our own rules as we go along.