SOUTHWICK, P.J.,
DISSENTING.
¶ 33. This appeal presents two tasks and one risk. We must decide what the evidence shows to be Ard’s customary acts of her usual employment and also whether the evidence proves that she no longer can perform them due to injuries to scheduled members.
¶ 34. The risk to be avoided, unless commanded by the statutory and controlling caselaw language, is creating a distortion to workers’ compensation law whereby relatively minor injuries are translated into the financial equivalent of a total loss of use of two scheduled members. Ard had only a five percent medical impairment in each wrist and may not even have had a loss of wage earning capacity. The majority still finds that she has a total loss of use. If such an outcome is what the statutes as interpreted by the Supreme Court require, then re-evaluation is for the writers of statutes or of Supreme Court *1247 opinions. Though we must go where the controlling authorities take us, I find that the majority went beyond those boundaries. Therefore, I write separately.
¶ 35. The relevant statutes provide two different approaches to compensation for injuries suffered by a worker during the course of employment. One is to determine the effect of the injury on an employee’s wage earning capacity. Miss.Code Ann. § 71-3-3® (Rev.2000) (definition of “disability”); Miss.Code Ann. § 71-3-7(Rev.2000) (compensation is paid for “disability”); Miss.Code Ann. § 71-3-17(e)(25)(Rev.2000) (paid on difference between average weekly wage at time of injury and the worker’s wage-earning capacity “in the same employment or otherwise” after maximum recovery). This is traditionally referred to as an injury to the “body as a whole.”
¶ 36. The other compensation scheme is for injuries to specific bodily appendages or functions. Miss.Code Ann. § 71-3-17(c)(l)-(21) (Rev.2000). Under the compensation plan applicable to “scheduled members,” benefits are paid for a specific number of weeks depending on what part of the body has been “lost,” meaning removal from the body. The reason for most of the uncertainties of scheduled member law is that compensation for “total loss of use of a member shall be the same as for loss of the member.” Miss. Code -Ann. § 71-3-17(e)(22) (Rev.2000). Further, a partial loss of use is compensated proportionately. Miss.Code Ann. § 71-3 — 17(c)(23) (Rev.2000).
¶ 37. What might be noticed in the review of the law so far is that no judicial precedents have been cited. We should understand the statutory directions before considering how courts have interpreted those directions. Very little of the significant matters which cause my respectful disagreement with the majority are because of statutory language. The dispute is over the meaning of court opinions that have taken the relatively sparse statutory language and provided interpretive embellishments.
¶ 38. What is clear about scheduled member compensation is that often there is no need to show that the injury has caused any loss of wage-earning capacity. Outside of the scheduled member regime, compensation is paid only for a “disability,” which is “an incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the" same or other employment,” a matter to be shown by medical evidence. Miss.Code Ann. § 71-3-3(1) (Rev.2000). However, if there has been a total loss of a scheduled member, such as the loss of an eye, there is no need for the employee to prove what impact that loss has had on his ability to earn the wages he had been receiving prior to the injury. McKenzie v. Gulf Hills Hotel, Inc., 221 Miss. 723, 726, 74 So.2d 830, 830 (1954). Even if the employee may be able to perform the assigned duties just as effectively without that eye, the full benefits provided by statute still must be paid. Id.
¶ 39. Similarly, the impact of a partial loss of use of a scheduled member on the ability of that worker to earn wages is not relevant if compensation solely for the level of medical disability is being claimed. Though the statute on partial loss of use does not explicitly distinguish medical disability from industrial disability, Miss.Code Ann. § 71-3-17(c)(23) (Rev.2000), the case-law has held that providing benefits based on the percentage of “functional or medical impairment” does not require proof of an impact on wage earning capacity. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1247 (Miss.1991). It is logical to make medical limitations the foundation of statutory partial loss of use. If a total physical loss of a scheduled member is compensated with a *1248 specific level of benefits regardless of impact on wages, then to the extent the medical profession can place a percentage on the loss of physical use of that same member, it is logical to provide that percentage of total benefits. In this situation, again, impact on wages is irrelevant.
¶40. Where the impact on wages is relevant in a scheduled member case is when the worker is seeking benefits greater than the physical, i.e., the medical, loss of use. “[T]he Act arbitrarily schedules the compensation payable for loss of or loss of use of a scheduled member, focusing upon a claimant’s functional [or medical] loss and without regard to loss of wage earning capacity.... However, in some cases, despite a partial functional loss of a scheduled member, the claimant’s industrial or occupational disability or loss of wage earning capacity controls his degree of disability.” Smith v. Jackson Constr. Co., 607 So.2d 1119, 1126 (Miss.1992) (emphasis added); see also Walker Mfg. Co., 577 So.2d at 1247 (injuries to scheduled members involve either “functional impairment or medical disability” alone, or “loss of wage-earning capacity, occupational or industrial disability, if you will,” if the functional impairment exceeds the medical one).
¶ 41. Therefore, whether impact on wage earning capacity is relevant in a scheduled member case is controlled by the claimant-worker or, more neutrally, by the facts. If the worker seeks only the level of benefits based on the percentage of medical impairment, then impact on wages is irrelevant. If the claimant seeks greater benefits, then the effect on wages is in play.
¶ 42. “Wages where?” is the next matter of concern. From the very first Supreme Court opinion on scheduled member injuries, the concern has been the worker’s ability to perform the “substantial acts required of him in his business.”
[I]n order for one to be totally disabled within the meaning of a health or accident insurance policy, it is not necessary that he be wholly incapacitated to perform any duty incident to his usual employment or business, but, if the insured is prevented by his injury or illness from doing the substantial acts required of him in his business, or if his physical condition is such that, in order to effect a cure or prolongation of life, common care and prudence require that he cease all work, he is totally disabled within the meaning of such policies.
M.T. Reed Constr. Co. v. Martin, 215 Miss. 472, 477-78, 61 So.2d 300, 303 (1952)(em-phasis supplied; first scheduled member case under the Act; overruled in part in Smith v. Jackson Constr. Co., 607 So.2d at 1128), quoting Mutual Benefit Health & Acc. Ass’n v. Mathis, 169 Miss. 187, 191-92, 142 So. 494, 496 (1932). For that rule, the Mathis court cited the case which is quoted next. Id. Thus language quite similar to what we are now applying for scheduled member injuries under the workers’ compensation statutes is one hundred years-old, predating the statutes by fifty years:
One who labors with his hands might be so disabled by a severe injury to one hand as not to be able to labor at all at his usual occupation, where as a merchant or a professional man might by the same injury be only disabled from transacting some kinds of business pertaining to his occupation. * * * There are a few propositions applicable to the construction of the policy under consideration which, under the evidence, are decisive of this case. The first is that total disability does not mean absolute physical inability on the part of the insured to transact any kind of business pertaining to his occupation. It is sufficient if his injuries were of such a character that common care and prudence *1249 required him to desist from the transaction of any such business so long as it was reasonably necessary to effectuate a cure. This was a duty which he owed to the insurer as well as to himself.
Metropolitan Cas. Ins. Co. v. Cato, 113 Miss. 283, 300, 74 So. 114, 117 (1917), quoting Lobdill v. Laboring Men’s Mut. Aid Ass’n, 69 Minn. 14, 71 N.W. 696, 696-97 (1897).
¶ 43. The Supreme Court summarized the insurance policy rule for total disability, which through the mystery of jurisprudential transubstantiation became the workers’ compensation rule for scheduled member injuries:
But when the insured is prevented by his injury from doing all the substantial acts required of him in his business, he is within such a provision of the policy, notwithstanding the fact that he occasionally is able to perform some single act connected with some kind of business pertaining to his occupation.
Metropolitan Cas. Ins. Co. v. Cato, 74 So. at 118, quoting 1 C.J.S. Accident Insurance § 164 (1914).
¶ 44. More recently, the terminology has frequently been that a worker has suffered a total loss of use of a scheduled member when he is no longer able to perform the substantial acts of the person’s usual occupation. McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 166 (Miss.1991).[1]
¶ 45. Terminology from private disability insurance policies that centered on a worker’s specific current occupation was of uncertain relevance and was not even suggested by the statute. Regardless of whether someone purchasing disability insurance obtained protection from the hazards of no longer being able to engage in his or her current occupation, the workers’ compensation statute does not generally provide benefits on this basis. Instead, “disability” for which benefits usually are paid requires consideration of all possible jobs suitable for the claimant. Miss.Code Ann. § 71-3-3(i)(Rev.2000) (disability is the inability to earn wages “in the same or other employment”).
¶ 46. Workers’ compensation is not at its core an occupational disability insurance policy. It is a public benefits program to compensate workers who, due to job-related injury, have had their ability to earn wages reduced or even eliminated. What is done in the scheduled member section of the program, which has compromises and presumptions built into it, should not by judicial fiat become totally detached from that core purpose. I find that the Supreme Court has not made that severance. I am concerned that the majority in this case does. We must consider the worker’s “customary acts” and “usual occupation,” but the manner of identifying those should be as consistent as possible with the workers’ compensation statutes.
¶ 47. Perhaps it could be argued that limiting the relevant jobs only to those in the worker’s usual occupation is part of the compromise inherent in the statutes since maximum scheduled member benefits can be viewed as being less than the maximum benefits awarded for injuries to the whole body. First, there is no hint of that reasoning in the caselaw that created this rule. See M.T. Reed, 215 Miss. at 472, 61 *1250 So.2d at 300. Secondly, benefits are less if by that it is meant that the maximum number of weeks that benefits may be paid for loss of a scheduled member is 200 weeks, while total permanent disability to the whole body permits benefits to be paid for 450 weeks. Miss.Code Ann. § 71-8-17(c)(1) & (c)(25) (Rev.2000). It is also true that benefits will be paid for injury to a scheduled member regardless of any impact on wage-earning capacity. Still, what differences there are were created by the legislature. They are for us to enforce, not circumvent.
¶48. More likely, the terminology in the caselaw was an accident of the insurance precedents used as analogies in the early workers’ compensation appeals. The statutory word “use” did not have to mean use in a former occupation as opposed to use in any employment. I find the focus on occupation to be an inexplicable but irretrievable conclusion in the scheduled member area.[2] It creates an artificiality in those scheduled member cases in which the claimant is seeking benefits greater than would be awarded simply on the basis of the medical/functional limitations.
¶ 49. It is working with this judicially required artificiality that creates the risk referenced at the beginning of my opinion. A narrow definition of occupation such as taken by the majority here greatly increases the frequency of benefits for total loss of use even when the worker is quite able to perform an array of related jobs. The income level of those jobs, i.e., the effect of the injury on wage-earning capacity, would be irrelevant. The broadest possible definition, and I am not sure what that would be, would cause benefits for total loss of use to be awarded only in situations in which the person was unable to work. If a person were totally disabled by a scheduled member injury, though, that worker would be entitled to benefits for total permanent disability under the general (not the scheduled member) provisions. Smith v. Jackson Construction Co., 607 So.2d at 1126.
¶ 50. I note a 1966 case that the majority finds to constitute the “smoking gun” of clarity — the metaphor is mixed intentionally, as I believe smoke is more dominant than clarity. Bill Williams Feed Serv. v. Mangum, 183 So.2d 917 (Miss.1966). First, the very fact that a phrase taken from a thirty-five year old opinion becomes the answer to the uncertainties before us suggests that a rather slender reed is being made to bear a rather large weight (another change in metaphors). Secondly, the meaning of the “substantial acts of the employment in which he was engaged when injured” (id. at 920), a clear explication according to the majority, is not in my view necessarily limited to the precise job at the moment of injury. The “customary acts of usual employment,” which is the usual phrasing, has not in many if any cases been interpreted to be the exact prior job. All judges (including this one) and perhaps all writers have experience with writing phrases with less precision than in hindsight was desirable. Thus whether that Mangum judge was attempting to bring clarity that does not appear before or since, or whether that judge just used a phrase that can be misinterpreted, can be determined in part by what other caselaw has declared.
¶ 51. That other caselaw is my final point about Mangum. There are too many other and later cases that do not use the Mangum language. Most pointed is the language in a 1991 decision. What should be noted is the range of evidence *1251 useful in proving whether the industrial impact of an injury to a scheduled member exceeds its medical effect:
First, the Commission found that Cantrell [who claimed total loss of use despite only a five percent medical effect from a hand injury] had failed to offer evidence, following his last surgery— that performed by Dr. Gassaway on October 27,1987 — that he had attempted— unsuccessfully — to perform his usual duties. This is true. There is nothing in the record suggesting that following his recuperation from his last surgery Cantrell attempted, with Walker Manufacturing or any other employer, to perform duties like unto those he was performing prior to his injury back on September 9, 1985. Second, the Commission found that Cantrell had failed to produce “any witnesses to corroborate his statements of inability to work or perform the usual duties of his customary employment.” This again is true. Cantrell’s case stands or falls on his own testimony. He called no other witness, nor did he elicit any corroborating testimony from employer’s witness.
Third, the Commission found that Cantrell had failed to offer evidence “that he was refused employment based upon the disability to his hand.” Cantrell testified that following his discharge from Walker’s employment, upon his failure to return to work, he sought employment with [certain other named companies]. All of this amounts to little,as Cantrell later took a job with Greenwood Slacks in Gattman, a company maintaining a pay scale like unto Gatt-man’s and Hollis.
A claimant such as Cantrell must make a reasonable effort to secure other comparably gainful employment.
Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1248-49 (Miss.1991) (emphasis added). I agree that the Walker Mfg. Co. description is consistent with most scheduled member caselaw, except for the last point about a requirement of seeking other employment. It is probably more accurate to say that evidence that no other employment was sought weakens the claim of inability to perform the substantial acts of the usual employment, while proof of seeking and failing strengthens the claim. At least one case clearly rejects that seeking other employment is a prerequisite to a claim for total loss of use of a scheduled member when the medical loss is only partial. McGowan, 586 So.2d at 168.
¶ 52. With respect for the majority, I find that Mangum is just one case of many that must be examined. More than the job at the moment of injury is usually the focus.
¶ 53. What I find significant about the schedule created for benefits that are payable on injuries to certain identified parts of the body is that it is capable of providing a simple and predictable answer. However, as soon as the claimant seeks benefits greater than the medical limitations on that member, the simplicity and predictability -are lost no matter whether the concern is the impact on a specific occupation or on all job opportunities. To some extent, the majority here is forcing a simple answer by drastically limiting what is the relevant occupation. Basically, unless this worker can return to the job she was performing at the time of injury, she is entitled to benefits for total loss of use. It is true that “disability” is not an inevitable consideration in scheduled member compensation, but that is because the schedule is a rough approximation of the impact on a worker of losing one of these members. 4 LaRSOn’s WoRKees’ Compensation Law § 86.02 (2001). The majority here, though, by using a narrow definition of “customary acts of usual employment,” would so suppress disability as a consideration that the equitable balance in the compensation scheme is lost.
*1252 ¶ 54. Instead, I find that the definition of “customary acts of usual employment” should include consideration of such matters as the worker’s training, education, work history, and skill. Whether all those factors are relevant, and whether others should be included, should in the first instance be determined by the Commission. The proper meaning of this controlling phrase has been entirely too obscure and elliptical, and perhaps usually ignored once it is quoted. The Commission on remand and in the future should give rigorous attention to what should be considered in making this determination. In order to give effect to the precedents on scheduled member compensation, the Commission should assure that the factors for customary acts of usual employment center more on the claimant’s work experience than is the case in “the same or other employment” analysis for injuries to the body as a whole. Miss.Code Ann. § 71 — 3—3(i) (Rev. 2000). Yet those factors for “usual employment” must reach beyond the work requirements of the position held at the moment of injury. I would remand since the initial analysis should draw from the Commission’s expertise.
¶ 55. The starting point for these considerations is that the worker has an injury to a scheduled member, that the medical impairment is less than total loss of use, but the claimant is seeking compensation for a greater degree of occupational impairment. As the Commission examines the occupational effect of the injury on use of that scheduled member, it should determine the broad category of occupation into which this worker should be placed. At least preliminarily reasonable would be that if a person in his work experience had primarily engaged in strenuous physical labor, then the issue under “customary acts of usual employment” would not be only whether he can still, for example, lift the significant weight of air conditioning units since that is what he was doing when injured, but whether in practical terms unskilled jobs involving physical exertion are now closed to him because of the limitation on use of his arm. If lower paying jobs are available, perhaps involving less physical exertion but no more skill than this worker has obtained, then those too should be considered. Since the Supreme Court has spoken of a “claimant’s loss of wage earning capacity” as establishing “his degree of disability” in a scheduled member case, then the wages obtainable at these other positions would determine the degree of industrial loss of use. Smith v. Jackson Constr. Co., 607 So.2d at 1126 (disability relevant only if seeking benefits greater than for medical impairment).
¶ 56. It should be remembered that the claimant may never be left with less than the percentage loss of use as set by the medical impairment. Walker Mfg. Co. v. Cantrell, 577 So.2d at 1248. In that way the scheduled member predictability and simplicity are preserved in that a specific level of benefits will be paid regardless of effect on wage-earning capacity. Also preserved would be the Workers’ Compensation Act’s central purpose of protecting workers from no longer being able to receive the wages that were being earned at the time of injury.
¶ 57. In the present case, the Commission did not analyze the case in these terms. I do not find that Ard’s occupation should so narrowly be defined as being a poultry plant assembly line worker whose customary acts involve repetitive arm motion. According to the administrative judge’s opinion that was adopted by the Commission, these were her customary acts and employments prior to the injury:
1) Using a screwdriver all day at a manufacturing plant;
2) Using scissors to trim pieces of chicken at a processing plant;
*1253 3) Packing clothes at a garment plant, which involved lifting;
4) Monitoring trucks at a construction company, which required her to write on a pad;
5) Working as a nurse’s assistant at a mental retardation center, which involved significant lifting of patients.
6) Operated an offset printing machine, which among other requirements involved picking up heavy reams of paper;
7) At Marshall Durbin, where she twice worked, she worked at a conveyor belt, trimming meat, deboning, and packing. ¶ 58. The Commission reviewed the
report of a vocational rehabilitation consultant. Though the majority does not directly address the admissibility of this report, I find that Ard’s seeking benefits for total loss of use despite only a five percent medical impairment rating made the report and other evidence relevant and admissible. There were various unskilled jobs, not involving repetitive motion, “such as desk clerk, data entry operator for hotel registration, telemarketer, dispatcher, security guard, and sales clerk.” Under my view of the usual occupation in which Ard was engaged, what is relevant are jobs in which education and specific skills are not important, and which primarily involve physical or, perhaps, conversational skills. The Commission relied in part on Ard having “a high school diploma and certificates in certified nursing [assistance], printing, and retail sales work. She was articulate and pleasant in appearance at the hearing.”
¶ 59. What the Commission observed was that Ard formerly worked in a variety of fields, many but not all involving significant physical exertion. She is still quite capable of performing jobs involving the same education and skill level, but only with less physical exertion and no repetitive motion. Those jobs exist, but the Commission found that Ard had an occupational disability, of 25% in each hand. I find that such a number should be based on the impact of the limitations on Ard’s ability to earn wages. That sort of analysis is not in the Commission’s decision, but the employer does not challenge the fivefold increase. Ard’s average weekly wage at the time of injury was $270. Assuming that she worked 40 hours per week, her hourly wage was $6.75. The Commission found that she could continue working at $6.00 or $7.00 per hour. Thus I am not convinced that there was evidence of a 25% industrial disability, but the employer does not contest that figure on appeal. This comparison of her wage earning capacity before and after injury is relevant only because Ard sought to increase the benefits beyond what the five percent medical rating would have provided.
¶ 60. In summary, I find that before Ard’s carpal tunnel injuries in both wrists could be found to prevent her from being able to perform the customary acts of her usual employment, the Commission should on remand identify the appropriate factors that define that employment. Such matters as training, education, work history, and skill would be potential considerations. Then a decision would be reached about whether Ard’s arms, wrists and hands blocked her from such employment. The fact that her most recent work involved repetitive motion does not mean that her usual occupation must be found to include repetitive motion tasks. Within her usual employment are a variety of tasks, i.e., customary acts. To the extent she can perform some but not all, her ability to earn may have been reduced and proportionate compensation should be awarded.
¶ 61. If broad occupation categories are identified at the Commission level, some order could be brought to what otherwise is continuing disorder. The Commission *1254 by rule or at least in its decisions case by case should consider these matters.

Conclusion

¶ 62. Whatever precise formulation is adopted for measuring loss of use, the total number of weeks for a permanent partial scheduled member injury is much less than the 450 weeks for nonscheduled injuries. That is built into the system. Even under the majority’s approach, the benefits for the same inability to perform the same acts of the same employment could vary widely. Depending on whether the inability arises from total loss of use of an arm, an eye, or even a toe, the worker will receive 200, 100, or 30 weeks of benefits, respectively. The majority’s analysis just makes it much more likely that a total loss of use will be found and not only a partial loss.
¶ 63. The central ambiguities of scheduled member law arise from the approach that it takes. The schedule constitutes liquidated damages for dismemberment or for physical limitations less than amputation, a scheme that is totally unconcerned about the effect of those injuries on wages. Yet for other injuries, the Supreme Court has said that the degree to which the claimant can no longer perform the customary acts of the former employment becomes the measure of proportionate loss. That to me means defining the appropriate employment and then using the only relevant measure of proportionate job loss, which is reduction in wage capacity for that kind of employment. It is at this point of departure, when computing benefits just for physical loss is replaced by a need to compute for industrial loss, that the logic of the scheduled member approach falters.
¶ 64. The majority would maximize benefits to the employee by defining customary acts of usual employment as narrowly as possible, perhaps even to being just the job at the moment of injury. To gain simplicity, the majority alters the statutory balance. The approach for which I have argued applies a broader definition of customary acts of usual employment, which I find more consistent with the statute and the judicial precedents. What neither approach directly accomplishes is to eliminate the statutory discrepancy between whole body and scheduled member benefits for measuring industrial disability. The majority may be haphazardly reducing the discrepancy by making maximum benefits under scheduled member rules available as often as possible. That neither conforms to the precedents nor is tailored to actual disability.
¶ 65. Finally, there is one provision of scheduled member law that should be addressed briefly. When there is a total loss of both hands or arms, both feet or legs, both eyes, or any combination, that “shall constitute permanent total disability.” Miss. Code Ann. § 71-3-17(a) (Rev.2000). “In all other cases permanent total disability shall be determined in accordance with the facts.” Id. As mentioned, a different subsection provides that compensation for total loss of use of a scheduled member is the same as for the loss of that member. Miss.Code Ann. § 71 — 3—17(c)(22) (Rev. 2000). I find that the reasonable interpretation of the permanent total disability provision is that the actual physical loss of two relevant members must have occurred before that provision is invoked.
¶ 66. Thus, even though the majority has, I believe erroneously (though I must admit to my own analytical error in workers’ compensation law on occasion),[3] found *1255 a total loss of use of two scheduled members, the court is not holding that this means total industrial disability. Indeed, that result would mean that a five percent medical impairment to each wrist, when joined with evidence that the normal acts of the usual employment can no longer be performed, becomes 450 weeks of compensation for permanent total disability. Here, the claimant is limited to partial disability under scheduled member principles since no proof of actual total disability was introduced. Total disability was not “determined in accordance with the facts.”
McMILLIN, C.J., THOMAS, AND CHANDLER, JJ., JOIN THIS SEPARATE WRITTEN OPINION.

. This precise language often has been a quote from a treatise, but the treatise author was discussing that part of M.T. Reed that also suggested that a person because of a scheduled member injury might no longer be able to work at all. McGowan v. Orleans Furniture, Inc., 586 So.2d at 166, quoting Vardaman Dunn, Mississippi Workmen’s Comp. § 86 n. 27 (3rd ed.1990) ("if he is prevented by his injury from doing the substantial acts required of him in his usual occupation, or if his resulting condition is such that common care and prudence require that he cease work, he is totally disabled within the meaning of the statute.”).

. The view is irretrievable by the Court of Appeals. It should be noted, though, that a significant part of M.T. Reed’s scheduled member analysis has already been overruled by the Supreme Court. Smith v. Jackson Constr. Co., 607 So.2d at 1128.

. An employee’s refusal to take a drug test after a workplace injury was found not to be a basis on which to deny workers' compensation benefits in Tyson Foods, Inc. v. Hilliard, 772 So.2d 1103, 1106-7 (Miss.Ct.App.2000) *1255 (Southwick, P.J.). What was not pointed out by the parties or the Commission, not discovered nor remembered by this writer, but which was relevant in the analysis, is that “intoxication of the employee” can be a reason to deny benefits; further, if an employer has probable cause to believe an injury was caused by alcohol or drugs, the employee can be required to submit to a test. Miss.Code Ann. §§ 71-3-7 & 71-3-121 (Rev.2000). These two statutes do not address the effect of refusing to comply with a testing demand.