800 So.2d 1164 (2001)
GOOD EARTH DEVELOPMENT, INC. and Liberty Mutual Insurance Company, Appellants
v.
James A. ROGERS, Appellee.
No. 2000-WC-00435-COA.
Court of Appeals of Mississippi.
April 24, 2001.
Rehearing Denied July 17, 2001.
Certiorari Denied December 6, 2001.
*1165 Donald V. Burch, Arthur S. Johnston, III, Jackson, Attorneys for Appellants.
Mark C. Baker Sr., Dannye L. Hunter, Brandon, Attorneys for Appellee.
EN BANC.
PAYNE, J., for the Court:

PROCEDURAL HISTORY
¶ 1. This is a workers' compensation case in which the administrative law judge found that James A. Rogers had sustained a one-hundred percent occupational loss of use of his left hand. Since the hand is a scheduled member, this injury resulted in a permanent partial disability, which the administrative law judge said qualified Rogers to receive disability benefits for one-hundred fifty weeks pursuant to Miss. Code Ann. § 71-3-17(c)(3) (Rev.2000). Feeling this award did not sufficiently cover his injuries, Rogers appealed to the Full Commission. In an order dated August 4, 1999, the Commission reversed the administrative law judge and found that Rogers had sustained only a sixty-five percent occupational disability rather than a one-hundred percent loss. The Commission ruled that Rogers was entitled only to permanent partial disability benefits for ninety-seven and a half weeks, which represented a sixty-five percent occupational disability attributable to his hand injury. Rogers then appealed to the Madison County Circuit Court and argued that he was permanently and totally disabled claiming one-hundred percent occupational disability. The circuit court reversed the Commission and found that, for purposes of Rogers's wage earning capacity, the impairment had adversely impacted his wage earning capacity to an extent greater than the medical percentage of impairment; thus, Rogers was totally occupationally disabled. Since Rogers was rendered permanently and totally disabled, according to Miss.Code Ann. § 71-3-17(a) (Rev.2000), he was entitled to permanent total disability benefits for 450 weeks. Good Earth now claims on appeal that the circuit court improperly substituted its judgment for *1166 that of the Commission in determining that Rogers was permanently and totally disabled, which contradicts the findings of the Commission. We hold that, because the Commission's ruling was without substantial evidence and was a misapplication of prevailing law, the circuit court's ruling should be affirmed.

FACTS
¶ 2. Additional facts will be addressed throughout this opinion; however, the basic facts are these: James Rogers was employed by Good Earth Development where he worked as a cabinet maker specializing in trim work. On January 11, 1996, while in the course and scope of his employment, Rogers's hand slipped and a saw blade cut his left hand. From this injury, Rogers, who is right-hand dominant, lost part of his left little finger and eventually his entire left ring finger was amputated. Rogers claims he is now permanently totally disabled as a result, since he had worked thirty-seven years as a trim carpenter and cannot continue in this work as a result of the injury. Rogers's physician, Dr. William Wallace, testified that the neuromas in Rogers's left hand could be very painful when stimulated by pressure or vibration or when exposed to cold temperatures, but such pain was not constant as long as Rogers did not apply direct pressure and avoided vibrations affecting his left hand. Pete Mills, a vocational rehabilitation expert, testified that in his professional opinion, Rogers is employable in a wide variety of other jobs including supervisory positions, security guard jobs, or any other job that did not require Rogers to use both hands.

ANALYSIS OF THE ISSUES PRESENTED

STANDARD OF REVIEW
¶ 3. With this appeal, Good Earth raises the following issues for our review:
I. DID THE CIRCUIT COURT ERR IN REVERSING THE DECISION OF THE MISSISSIPPI WORKERS' COMPENSATION COMMISSION AND RENDERING ITS OWN FINDINGS OF FACT?
II. DOES SUBSTANTIAL EVIDENCE EXIST IN THE RECORD TO SUPPORT THE FULL COMMISSION ORDER DATED AUGUST 4, 1999, AND THE FINDINGS AND AWARD CONTAINED THEREIN?
¶ 4. Our standard of review regarding workers' compensation cases has clearly been stated:
The standard of review in workers' compensation cases has clearly been established in our prior holdings. The Workers' Compensation Commission sits as the `ultimate finder of facts' in deciding compensation cases, and therefore, `its findings are subject to normal, deferential standards upon review.'
We hold that judicial review of findings of the Commission extends to a determination of whether they are clearly erroneous. And a finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act.
J.R. Logging v. Halford, 765 So.2d 580 (¶¶ 12-13) (Miss.Ct.App.2000) (citations omitted).

DISCUSSION OF THE ISSUES
¶ 5. Since both of the issues raised in this appeal deal with the circuit court's treatment of the Commission's finding, we examine both issues together. We initially *1167 point out that Good Earth does not contest that an injury occurred, nor do they argue whether or not the injury was work-related both parties agree on these points. What is contested is the extent of occupational disability that Rogers suffered due to his on-the-job injury. Good Earth argues with this appeal that the circuit court usurped its standard of reviewing the Commission when it substituted its findings of fact for those of the Commission. Good Earth also argues that substantial evidence did not exist to support the circuit court's order, and that the Commission's order should be reinstated. We disagree.
¶ 6. The circuit court's duty in reviewing the Commission was to search only for clear errors. J.R. Logging, 765 So.2d 580 at (¶ 13). Pursuant to its standard of review, the circuit court may only alter the Commission's findings if, although there may be some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission. Id. The Commission's judgment noted that fifty-nine year old Rogers has a high school diploma, has two years of military service, has full, unrestricted use of his dominant right hand, can use his left hand to perform light tasks which are not repetitive and which do not involve vibration, can drive, can operate a telephone or can work on a computer. In making these findings, the Commission reversed the administrative judge's assignment of one-hundred percent occupational loss disability award of a scheduled member and decreased it to a sixty-five percent occupational loss disability of a scheduled member. The Commission order essentially said that although Rogers was incapable of continuing in his previous occupation as a trim expert, he was still employable in some way and should have more fully explored the jobs for which the vocational rehabilitation expert suggested he may be qualified. The circuit court found that the Commission's order was clearly erroneous, was not supported by any substantial evidence, and was contrary to the substantial weight of the evidence. Also, the circuit court decided that by virtue of Rogers's impairment to his left hand, coupled with the sharp pains attendant to direct pressure on it, his wage earning capacity was adversely impacted to an extent greater than the percentage of medical impairment and he has been rendered totally occupationally disabled. The court then found Rogers permanently and totally disabled and awarded him permanent total disability benefits. With this opinion, we break down those findings of the Commission which we find show clear error. In doing so, we reach the conclusion that the Commission was clearly erroneous in its findings, and the circuit court properly found that Rogers was permanently and totally disabled.

I. History of law regarding scheduled member injuries which result in total occupational disability.

¶ 7. The nature of this case dictates that we review the evolution of law in situations such as the present where a scheduled member injury arguably results in a permanent occupational disability. At the outset, we note the applicable statutory provisions concerning permanent total disability and permanent partial disability with regard to scheduled member injuries.
(a) Permanent total disability: In case of total disability adjudged to be permanent, sixty-six and two-thirds percent (66-2/3%) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, shall be paid to the employee not to exceed four hundred fifty (450) weeks or an amount *1168 greater than the multiple of four hundred fifty (450) weeks times sixty-six and two-thirds percent (66-2/3%) of the average weekly wage for the state. Loss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two (2) thereof shall constitute permanent total disability. In all other cases permanent total disability shall be determined in accordance with the facts....
(c) Permanent partial disability: In case of disability partial in character but permanent in quality, the compensation shall be sixty-six and two-thirds percent (66-2/3%) of the average weekly wages of the injured employee, subject to the maximum limitations as to weekly benefits as set up in this chapter, which shall be paid following compensation for temporary total disability paid in accordance with subsection (b) of this section, and shall be paid to the employee as follows:
. . .
Member Lost Number Weeks Compensation
(3) Hand 150
Miss.Code Ann. § 71-3-17(a)(c) (Rev. 2000). Having stated the applicable statutory guidelines, we next look to case law.
¶ 8. The first case we examine is M.T. Reed Constr. Company v. Martin, 215 Miss. 472, 61 So.2d 300 (1952). In M.T. Reed, Martin, the injured worker, was a carpenter. While working in this capacity, Martin broke his right leg and was hospitalized for two months. After the leg healed, it was one-quarter inch shorter than his other leg, he had trouble walking because of his newly-acquired limp, his knee swelled at times to two inches larger than normal, and he continually had to take medicine to control the pain, all conditions the doctor said would remain with Martin the rest of his days. M.T. Reed, 61 So.2d at 301. Due to his work-related injury, Martin was now unable to climb ladders and do the routine work required of a carpenter. Id. The supreme court ultimately held that, by reason of his injury, Martin was prevented from doing the substantial acts required of him as a carpenter, which was the only job he had been trained to perform. Id. at 302. The court did say, however, that since Martin's injury, which rendered him totally and permanently disabled, dealt with only his leg, he was only entitled to recover the statutorily scheduled amount at one-hundred seventy-five weeks. Id. at 303.
¶ 9. Several years later the supreme court again revisited M.T. Reed. The facts of Smith v. Jackson Constr. Co., 607 So.2d 1119 (Miss.1992), show that Wilson Smith performed construction work for Jackson Construction. In the course of Smith's work, a jackhammer fell and hit his leg. After receiving medical treatment, Smith was ultimately left with a leg that hurt so badly that he could not stand in one position for any length of time before his leg swelled, forcing him to sit. Smith, 607 So.2d at 1122. Evidence presented showed that Wright was unable to find other work due to his disability. Smith, 607 So.2d at 1125.
¶ 10. The Smith court addressed the issue of whether a worker should be rendered permanently totally disabled when he injures a scheduled member so extensively that the resulting occupational disability exceeds the percentage of medical impairment assigned to the member. The supreme court found this to be the case and, in so finding, the court overruled M.T. Reed:
It would seem that if a claimant is permanently and totally occupationally disabled, he should be entitled to compensation for a permanent total occupational disability, not a permanent partial disability. Compare Miss.Code Ann. § 71-3-17(a) with § 71-3-17(c) (Supp.1991). To say that a person with a loss or loss *1169 of use of a scheduled member has but a permanent partial disability fails to take account of loss of wage earning capacity. If in light of that loss the claimant is actually rendered permanently and totally disabled, then there is no reason to disallow him permanent total disability compensation as provided by Section 71-3-17(a). Coverage under Section 71-3-17(c), including its familiar schedule, proceeds on the faith that the worker will be able to resume the same or other employment after he adapts to his disability. If after this period of adjustment the worker remains permanently and totally occupationally disabled, he by definition does not have a permanent partial disability and so the schedule found in Section 71-3-17(c) cannot control. Such a person should of right receive permanent and total disability compensation. Any other result is a travesty of justice which denies an employee injured in the course of his employment the compensation he is lawfully entitled to receive....
Where an employee suffers an injury covered by the schedule in Section 71-3-17(c) and where that injury results in a permanent loss of wage earning capacity within Section 71-3-17(a), the latter section controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in Section 71-3-17(c)'s schedule....
Allowing compensation for a permanent partial loss of a scheduled member takes no account of a claimant's loss of wage earning capacity. If a claimant is unable to earn wages despite only a loss or loss of use of a scheduled member, then the claimant is permanently and totally disabled.
Smith, 607 So.2d at 1127-28 (emphasis added).
¶ 11. In Smith, the leg injury resulted in medical impairment of fifteen percent to the body as a whole or a thirty percent permanent partial impairment to his leg. Id. at 1122. The question arose regarding what label to place on Smith's disability since, as one doctor stated, "Smith would be permanently limited in his work." Smith, 607 So.2d at 1125. Smith unsuccessfully sought other employment and was not trained in other fields, and though Smith's disability was only to his leg, which is a scheduled member, the court found that this disability rendered him unable to perform the substantial acts of his usual employment. The supreme court reversed and remanded back to the Commission with instructions that they determine the percentage of Smith's occupational disability. They also instructed on remand that if Smith suffered a total loss of wage earning ability, then he should be entitled to compensation for permanent total disability. Otherwise, his payment should be made according to the schedule for permanent partial disability. Smith, 607 So.2d at 1128.
¶ 12. Looking to a post-Smith case, in Alumax Extrusions, Incorporated v. Wright, 737 So.2d 416 (Miss.Ct.App. 1998), this Court again addressed the question of whether the worker's injury so substantially impaired his ability to do the substantial acts of his usual employment that he was rendered totally disabled. In that case, Larry Wright, the injured worker, was twenty-seven years old, did not have a high school diploma, and had only worked in manual labor type jobs. While engaged in his work at Alumax, Wright fell from a ten foot platform and landed squarely on his right shoulder, seriously injuring his coinciding rotator cuff and collarbone. Alumax, 737 So.2d 416 at (¶ 3). After medical treatment, Wright continued working, though not in the same capacity *1170 as he had before the accident. Id. at (¶ 4). Wright thereafter continued in physical therapy treatments and searched for a job, but found no work. Id. at (¶ 6).
From the outset we must observe the distinction between the medical or functional impairment of a scheduled member, and an occupational impairment to the same. Our supreme court has recognized that the former represents actual physical infirmity while the latter is a function of such, affecting the claimant's ability to perform the duties of employment. Therefore a claimant having only a partial impairment to a scheduled member may, through other considerations, establish that, for purposes of his wage earning capacity, the impairment has rendered him or her totally occupationally disabled. In such event, the claimant is entitled to compensation for complete disability under § 71-3-17(a). Similarly, a claimant seeking compensation for an occupational disability to a scheduled member which exceeds the assigned partial functional impairment and yet falls short of 100% must establish under § 71-3-17(c) that the partial impairment has adversely impacted his or her wage earning capacity to an extent greater than the medical percentage of impairment.
Alumax, 737 So.2d 416 at (¶ 15) (citations omitted) (emphasis added).
¶ 13. In Alumax, Wright was able to return to work after surgeries and physical therapy, but he was only able to perform light duty tasks, and he still suffered serious pain in doing so. Id. at (¶ 4). This Court found that Wright's shoulder injury did not so substantially impair his ability to work as to qualify as a total occupational disability. Though this fact differs from the present case in which Rogers indeed suffered a serious injury as to render him totally unable to return to his previous work, the Alumax court did reiterate the applicable rule that, "[i]t is the effect upon one's occupational capabilities which is determinative." Id. at (¶ 13).
¶ 14. Finally, we also look to Robinette v. Henry I. Siegal Co., 801 So.2d 739 (Miss.Ct.App.2000), wherein this Court took up the issue again concerning the effect of an injury to a scheduled member and whether such injury can result in a total permanent disability. In Robinette, the injured worker suffered from carpal tunnel syndrome as a result of her work at a clothing factory. The majority of this Court agreed with the Commission's finding that the only uncontradicted and unimpeached medical evidence of percentage of medical disability was that of one doctor who found that Robinette suffered a five percent permanent partial medical disability to her right arm and a seven percent permanent partial medical disability to her left arm. Robinette at (¶ 3). In so finding, the court declared that the facts did not support Robinette's contention that she was permanently disabled; rather, this Court viewed the doctor's testimony to mean that Robinette could suffer similar future injuries were she to return to the same type of work. Id. at (¶¶ 14-15)
Dr. Frazier did testify that he cautioned Robinette against the advisability of continuing employment that involved repetitive motions similar to those at her job with H.I.S. However, he testified that this advice was based primarily upon the conclusion that Robinette was physiologically disposed to such injuriesa condition that predated her employment at H.I.S.and not particularly because continued stress of this nature would aggravate a condition attributable to her previously-incurred injuries.
Robinette, 801 So.2d at 742 (¶ 4). This Court found that Robinette was not prohibited *1171 by her doctor from returning to her former employment; rather, the doctor anticipated that Robinette may experience similar pain in the future were she to do so. "Her decision not to return to her previous employment after her substantial recovery may have been prudent based on the likelihood that such injuries would reoccur, but that is not the same thing as saying that her previous work-related injuries continued to render her disabled from resuming her former employment." Id. at (¶ 15). We can distinguish the present case from Robinette, though, by contrasting the facts of each case. After all, Robinette dealt with the doctor's speculation that the worker would probably suffer the same hurt were she to return to her former employment; in the present case, it is uncontradicted that Rogers's injury renders him now and forever unable to return to his usual work of carpentry.

II. Application of cited authorities to Rogers's case.

A. Medical evidence.
¶ 15. Having reviewed the applicable statutory rules and case law, we apply such authority to the evidence in the present case. First, regarding medical evidence, Dr. Wallace, Rogers's primary treating physician, testified before the administrative judge that Rogers underwent several surgical procedures on his hand. Though Rogers's second and third fingers were not seriously injured, his little finger was half amputated, his ring finger was shortened at the first joint, and even after several surgeries, he had no feeling or motion in his thumb and could not grip with it. Rogers testified that "he has constant pain in his left hand," attributable in large part to the neuromas in his palm, ring finger and thumb which cause him pain when he touches anything. As stated previously, in the present case, Rogers and his physician have testified concerning the pain and treatments Rogers has undergone to treat his injured hand. Regarding employment, though, such treatments have essentially been to no avail because they have not restored Rogers's ability to continue working as a trim carpenter, a job in which his hands are essential to his performing his work. Precisely stated, as of result of this injury, Rogers is now rendered permanently incapable of performing the only job he had ever been trained to do. According to the standards taken from Smith and Alumax, Rogers's injury to his scheduled member rendered him unable to perform the substantial acts of his usual employment, and he should have been assigned a permanent total disability rating and received 450 weeks of benefits.

B. Testimony from Pete Mills, vocational rehabilitation therapist.
¶ 16. The next evidence we review concerns Rogers's inability to find other work. The Commission emphasized the evaluation by vocational rehabilitation therapist Pete Mills, who compiled various evaluations regarding Rogers's biographical information and his work history, and then found jobs he believed to be within the physical restrictions placed upon Rogers. When questioned on testimony before the administrative law judge concerning the job recommendations Mills submitted for which he thought Rogers was qualified, including security guard, convenience store clerk, or hotel desk clerk, Mills admitted that Rogers had worked his entire career as a carpenter, that Rogers had no law enforcement or sales background, nor did he have any computer training. How then could Rogers be qualified for the jobs which Mills recommended that Rogers pursue, with no training or physical capabilities to perform essential functions of each job? As *1172 well, it is obvious that all of these jobs require the use of two hands, which Rogers does not have, and that they require both hands to have dexterity and sensory capabilities, which Rogers does not have in his left hand. We conclude that the Commission clearly erred in relying on Mills testimony when, in fact, Rogers did not have the physical capabilities or training to perform the jobs which Mills recommended.

C. Evidence concerning Rogers's ability to work elsewhere.
¶ 17. Having found Rogers was incapable of working in those areas Mills suggested, we next look to the testimony of Jack Torrence, who owns Global Sector Services in Jackson. As previously addressed, one of the vocational areas for which Mills said Rogers qualified was security services. Torrence testified before the Commission that his business provides security services for buildings and employs officers who act as guards and patrolmen to monitor the premises of his customers' properties. Torrence stated that he spoke with Rogers, but did not offer him a job. When asked why, Torrence first testified that he had no job openings at the time he interviewed Rogers, but later he stated that he discovered during the interview that Rogers "had an impairment which would render him unavailable for some of the positions at that time." Torrence explained, "We need all of our security officers to have good hand dexterity with both hands in all positions, especially to be involved with the telephone at the same time making adjustments on monitors of actually today most of the surveillance equipment that's put in, especially if it's in a multiplex system, be controlled by keyboards. So it's pretty necessary to have both of your hands in good operation order." (emphasis added) Torrence noted that he did not discuss the impairment directly with Rogers because it was obvious just by looking that Rogers was impaired, as he was missing some fingers on his left hand; Torrence explained that from this observation alone he made his conclusion.
¶ 18. Torrence works in one of the vocational fields recommended to Rogers. If Torrence was convinced by mere observation that Rogers could not work in his services, this even before an interview, what basis would the Commission have had to speculate that Rogers will ever be able to be hired for such work, so long as his hand "gives him away?" Those other jobs Mills recommended to Rogers, including hotel and convenience store clerks, also involve using telephones and monitors of some sort, which generally require use of both hands. As representative of other employers, if Torrence concluded that Rogers could neither use a phone, monitor or keyboard in his work, could the Commission logically reason that other employers are unlikely to find that Rogers's inability to utilize both hands necessarily will preclude him from any job requiring such abilities? Accordingly, we conclude that the Commission clearly erred when it failed to acknowledge Torrence's testimony relating to evidence of Rogers's unemployable status stemming from his disability.

D. Loss of wage earning capabilities and Rogers's continued pain and suffering.
¶ 19. Finally, we would point out that the Commission failed to include in its judgment any discussion concerning the continuous pain Rogers suffers as a result of his work-related injury. "Factors to be considered in determining loss of wage earning capacity include the amount of education and training that the claimant has had, his inability to work, his failure to *1173 be hired elsewhere, the continuance of pain, and any other related circumstances." Alumax, 737 So.2d 416 at (¶ 16) (citing McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991)). The Commission did discuss several of these factors, including Rogers's loss of wage earning capacity, his education and training, and his failure to be hired elsewhere. However, the Commission declined to recognize that Rogers suffers continuous pain and suffering related to this accident. Reviewing Alumax once again, we find that there the doctor clearly recognized the worker's continuing pain, his inability to perform substantial acts of his most recent job due to such discomfort, and his earnest efforts at various forms of physical therapy. Alumax, 737 So.2d 416 at (¶ 16). In Rogers's case, as well, clear documentation and unrefuted testimony showed that Rogers suffers severe pain due to the neuromas on his hand from pressure and during cold weather. Thus, we find that the Commission erred in this respect.

CONCLUSION
¶ 20. We find that the Commission's reliance on Mills's report was erroneous in that the Commission failed to view Mills's recommendation in light of other evidence which clearly showed that Rogers was unable to perform the substantial acts of his usual employment and he was unable to perform any of these recommended jobs. This being the case, such evaluation concerning other jobs for which the injured worker may be qualified are of no concern due to the rule described in Alumax which states that if the worker is unable to return to the substantial acts of his usual employment due to an injury to a scheduled member which renders him totally occupationally disabled, such job hunt is unnecessary as the injured worker is entitled to permanent total disability benefits. Alumax, 737 So.2d 416 at (¶ 15). Rogers was unequivocally unable to return to his carpentry career by virtue of his work-related injury. Therefore, we find he is totally occupationally disabled.
¶ 21. The Commission was clearly erroneous in deciding this case without substantial evidence and in conflict with prevailing law because the testimony of vocational rehabilitation therapist Pete Mills, on which the Commission's decision was based, directly ignored Rogers's physical limitations, his inability to find work elsewhere, and his continued pain stemming from his work-related accident. In accordance with authorities cited herein and as the facts require, we find that Rogers's impairment to his scheduled member so substantially occupationally disabled him as to render him totally disabled. Therefore, we affirm the circuit court in their reversal of the Commission.
¶ 22. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT IS AFFIRMED. COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANTS.
KING, P.J., BRIDGES, LEE, IRVING, MYERS AND CHANDLER, JJ., CONCUR. McMILLIN, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SOUTHWICK, P.J., AND THOMAS, J.
McMILLIN, C.J., Dissenting:
¶ 23. I dissent. In my view, both the Commission and the majority of the Court have missed the mark in this case. I will set forth my reasoning as to each beginning with the decision of this Court.

I.
¶ 24. The majority has done nothing more than substitute its own view as to the weight and worth of the evidence concerning *1174 Rogers's inability to perform work outside his former employment for that of the Workers' Compensation Commission. That exceeds the authority of a judicial body reviewing a decision of an administrative agency such as the Commission. Sibley v. Unifirst Bank for Sav. Through Resolution Trust Corp., 699 So.2d 1214(¶ 18) (Miss.1997).
¶ 25. Rogers suffered an injury to a scheduled member (his left hand) that, by the medical and other proof, has every indication of permanently restricting his ability to use that hand. The Commission determined that he had suffered a sixty-five percent loss of use of the hand and computed his right to compensation under the provisions of Section 71-3-17 of the Mississippi Code.
¶ 26. In so finding, the Commission limited Rogers's entitlement to benefits to those relating to a scheduled member injury computed according to the provisions of Section 71-3-17(c). This constituted an implicit rejection of evidence advanced by Rogers indicating that his injury had the effect of rendering him unemployable in any fielda proposition involving a different statutory provision found at Section 71-3-17(a). The factors to determine compensation under Section 71-3-17(a) are, of course, significantly different from those relating to a scheduled member injury. Smith v. Jackson Const. Co., 607 So.2d 1119, 1125-28 (Miss.1992); Bradley, John. R., Scheduled Member Benefits for Total Loss of Use: Definition of "Usual Employment," pg. 4, Thirteenth Annual Workers' Compensation Practice and Procedure, November 9, 2000. It would appear that the Commission, in deciding that Rogers was not totally disabled from any gainful employment by virtue of his scheduled member injury, relied upon evidence presented by a vocational expert that he had identified a number of jobs available in the area that Rogers should be able to perform, even taking into account his limited use of one hand.
¶ 27. The majority embarks on its own evaluation of the weight and worth of this evidence and finds it unsatisfactory, thereby substituting its own view of that question for that of the Commission. The majority rejects this evidence primarily on the basis that Rogers has no history of working in the areas identified by the vocational expert. I am not aware of a rule that would require an injured worker to be fully trained and qualified to perform some alternate form of work at the very moment he reaches maximum medical improvement. Any time a person undergoes a career change, whether voluntarily or by force of circumstance, there is normally a period of training and adaptation to the new field of endeavor. There is no evidence in the record suggesting that Rogers, by virtue of advanced age or diminished intellect or some other impediment, is not capable of gaining those necessary skills that would permit him to adequately perform in some alternate field of employment that would be available to a person with limited use of one hand.
¶ 28. While it may be conceded that Rogers suffers from chronic pain in his injured hand and that the pain grows worse when the hand is put to constant use, there is, likewise, no dispute that the vocational expert took into account his diminished use of the one hand in identifying suitable alternate employment. So long as Rogers could reasonably be expected to find employment that would permit limited use of his hand and thereby further exacerbating his pain symptoms, there is no apparent reason why he should not be expected to pursue such endeavors rather than remain in an unemployed state where his symptoms of pain would be essentially the same.

*1175 II.
¶ 29. Despite my disagreement with the idea of reversing and rendering a judgment finding Rogers totally incapacitated from performing any work under Section 71-3-17(a), I nevertheless do not feel that the Commission's decision that Rogers suffered only a sixty-five percent disability to his hand is supported by substantial evidence. There seems to be little dispute that Rogers, by virtue of his inability to effectively utilize his left hand, is precluded from ever again being employed in the field of carpentry. In assessing the degree of incapacity arising out of an injury to a scheduled member, the Commission is required to inquire beyond the degree of physical impairment assigned by the medical experts and must, instead, assess the injured worker's degree of industrial incapacity. This has been defined as an injury that prevents the claimant from performing the substantial acts of his usual employment. McGowan v. Orleans Furniture Inc., 586 So.2d 163, 166 (Miss.1991). The evidence is overwhelmingin fact, there is no evidence to the contrary-that, viewed as a question of industrial rather than medical disability, Rogers has suffered a complete loss of the utility of his left hand. This would entitle him to 150 weeks of compensation, and I would reverse and render such an award.
SOUTHWICK, P.J., AND THOMAS, J., JOIN THIS SEPARATE WRITTEN OPINION.