# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-WC-01195-COA

**SABRINA L. DOUKAS**                                    **APPELLANT**

**v.**

**KILN SELF STORAGE AND FARMERS**                **APPELLEES**
**INSURANCE EXCHANGE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/26/2023 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANT: | JAMES KENNETH WETZEL |
| | GARNER JAMES WETZEL |
| ATTORNEY FOR APPELLEES: | MATTHEW JASON SUMRALL |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 10/08/2024 |
| MOTION FOR REHEARING FILED: | |

### EN BANC.

### BARNES, C.J., FOR THE COURT:

¶1.     Sabrina Doukas appeals the December 2020 and October 2023 decisions by the Mississippi Workers' Compensation Commission (MWCC), which held, respectively, that (1) Doukas was not entitled to indemnity benefits for an injury to her lower left-leg extremity; and (2) her prior compensable injury to her lower right-leg extremity did not render her permanently and totally disabled. Finding that the Commission's judgments are supported by substantial evidence, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On April 6, 2016, Doukas, a manager for Kiln Self Storage (Employer), was injured after a heavy piece of furniture fell on her right foot. As a result, Doukas, who had

uncontrolled type 2 diabetes,[1] developed an infection in her foot, which eventually required below-the-knee amputation of her right leg on April 19, 2016. She was fitted with a prosthesis in September 2016. The Employer and its insurance carrier, Farmers Insurance Exchange (Carrier) (collectively the Appellees), admitted the compensability of Doukas's injury and paid all temporary and permanent partial disability benefits (175 weeks)[2] related to the injury to her right lower extremity.

¶3. In May 2017, occupational therapy conducted a driver's evaluation of Doukas, and it was recommended that she come back for retesting because her visual acuity currently did not meet the minimum requirements for driving. A functional capacity examination (FCE) of Doukas was conducted on September 11, 2018. The FCE stated that Doukas, now fitted with a prosthesis, "note[d] multiple falls" but had recently received a new foot for her prosthesis and had "improvement in gait and balance since then." The FCE concluded that although she would be unable to return to her previous position, Doukas "meets the light to light/medium demand classification level."

¶4. A week later, Doukas filed a petition to controvert, claiming that she had 100% loss of wage-earning capacity (WEC) and that the Appellees had arbitrarily terminated compensation and medical benefits. In response, the Appellees denied that Doukas had sustained 100% loss of WEC. They noted Doukas was paid a salary in lieu of compensation

---

[1] Although Doukas's pretrial statement claimed that her diabetes was "undiagnosed" until this injury, medical records indicate Doukas was diagnosed with diabetes in 2011 but had been non-compliant with her insulin and oral medication.

[2] See Miss. Code Ann. § 71-3-17(c) (Supp. 2012).

from April 10, 2016, to April 22, 2016, and "has been paid indemnity at the rate of $324.36 from April 23, 2016 to present."

¶5.     Doukas achieved maximum medical improvement (MMI) on October 1, 2018, with 70% impairment to her lower extremity and 28% whole-body impairment with restrictions in accordance with the FCE.  Her treating physician, Dr. Samir Tomajian, agreed with the FCE restrictions and impairment rating.  Doukas filed a "Pretrial Statement of Claimant" on November 28, 2018, claiming that she "continues to experience residual pain, balance issues and swelling."

¶6.     In a deposition given on January 7, 2019, Doukas testified about two significant falls due to her ill-fitting foot on the prosthesis, but she noted after recently receiving a new foot, "[I] don't fall anymore . . . but my leg still hurts because I need a new leg."  When asked if her ability to earn a living had changed since the right-leg injury, Doukas replied, "Yes."  She noted, "I failed [the driving evaluation] because [the therapist] never gives a right leg amputee that," and she could not use modified driving controls because she is "dyslexic."  However, she insisted that she "could get a job and figure out a way because I've never missed a day from any job I've had for the last 17 years."  As to her work history, Doukas testified that she had worked at National Car Rental for fifteen years as a senior rental representative and manager.  Thereafter, she worked for a physician for more than a decade, which included spreadsheets, advertising, accounts receivable and payable until he later moved to Dallas.  She subsequently went to work for the Employer as an office manager where she worked for around seven years.  Doukas testified that she did not want to go on

3

disability and would "work, you know, if I can."

¶7.    On February 5, 2019, Doukas filed a motion to compel, seeking payment for medical treatment and services. She asserted that she was still experiencing "severe pain, swelling, sores and blisters to her right leg stump due to [an] ill-fitted prosthesis."[3] The Appellees moved for Doukas's motion to "be held in abeyance" because Doukas had yet to see the referred orthopedist for evaluation, whose opinion may "affect the prosthesis fitting." On February 22, 2019, the MWCC administrative judge (AJ) issued an order finding Doukas was "entitled [(1)] to be fitted with a prosthesis for her right leg and foot," as recommended by her pain management physician, Dr. Tomajian, and (2) to be evaluated by the orthopedic physician, and that "the [C]arrier shall be responsible and shall pay for same."

¶8.    One Source, the prosthetic supplier, provided Doukas with a new socket for her prosthesis on April 8, 2019. A few days later, Doukas allegedly fell in her driveway due to her ill-fitted prosthesis and sustained an injury to her left toenail. She sought medical treatment for her left foot on April 23, 2019. The physician's assessment was cellulitis of the left foot, a neurologic disorder associated with type 2 diabetes mellitus, an open wound of the left foot, and gangrene of the left toe. The medical report noted that Doukas's diabetes was "not well controlled." There was no mention of a fall or complaints about the prosthesis. Doukas was immediately referred to Memorial Hospital for further treatment. Doukas developed a septic infection in her left toe, eventually requiring amputation of her left leg below the knee on May 2, 2019. Weeks later, Doukas suffered a stroke.

_____

[3] Other issues were also raised that are not relevant to this appeal.

4

¶9.    A second deposition of Doukas was held on June 4, 2019. She said that the first day she had the new prosthesis for her right leg, "it would slip up and down." Doukas claimed that shortly thereafter, she went to move her car, and she "fell flat on the ground" and "ripped [her] toenail off [her] left leg." She testified that on her left foot, she was wearing a soft tennis-like shoe and a sock. Doukas claimed that her daughter, Morgan, was in the house at the time of the fall. When she showed Morgan her foot, "Morgan said, my God, what's all that blood? I'm like, it ripped my toenail." Doukas testified that she bandaged her left foot and called One Source. She was told not to wear the prosthesis until One Source could come out. She claimed that when she went to the hospital days later, the "vascular doctor said on the right leg, you can't wear that thing anymore, it don't fit right[.]"

¶10.   Doukas filed a motion to compel medical treatment and services on July 9, 2019, seeking "all medical and indemnity benefits to which she may be entitled [to] paid by the [C]arrier." In her motion, Doukas asserted "that on or about April 10, 2019," her right-leg prosthesis "cut into her right stump leg, causing sores and swelling issues." She claimed that these issues with her prosthesis made "mobility difficult," causing her "to trip and fall" and resulting in the injury to her left toe.

¶11.   A hearing before the AJ was held on October 10, 2019. Morgan testified that she had moved home from college in 2017 to assist Doukas and help monitor her diabetes medication. Morgan explained to the AJ that Doukas continually had problems with her prosthesis socket and that the loose fit of the prosthesis caused her mother to fall and develop blisters. In 2018, the foot on her prosthesis was replaced, but it still had the original socket

5

and shaft. Eventually, Doukas received the new socket in April 2019; the company tested her walking with the new prosthesis using parallel bars. Morgan said her mother fell outside a few days later. Morgan testified that she was not at home when her mother fell, but when she returned home from college classes later that day, her mother's left toenail had been pulled back.[4] Because of the stroke, it was difficult for Doukas to provide meaningful testimony, but her medical records and depositions, as well as the depositions by two One Source employees, were reviewed by the AJ.

¶12. On June 26, 2020, the AJ entered an order finding that Doukas's fall in April 2019 and the resulting amputation to her lower left leg were "causally related to her original work-related accident on April 6, 2016." The AJ ordered that Doukas be awarded "[p]ermanent total indemnity benefits beginning April 10, 2016, and continuing for a period of 450 weeks." *See* Miss. Code Ann. § 71-3-17(a) (Rev. 2011). The Carrier was ordered to pay "all reasonable and necessary medical services and supplies as the nature of her injury or the process of her recovery . . . may require in accordance" with Mississippi Code Annotated section 71-3-15 (Rev. 2011) and the medical fee schedule.

¶13. The Appellees filed a petition for review by the full Commission, arguing that the AJ erred in finding that the amputation of Doukas's "left lower extremity" was related to her April 2016 compensable work injury. On December 7, 2020, the Commission reversed the AJ's ruling that the left-leg injury was compensable but "affirmed her finding that Doukas's

---

[4] This testimony directly contradicts Doukas's version of the events; she claimed that Morgan was home at the time and that the fall occurred on a Sunday.

stroke was not compensable."[5] The Commission remanded the case to the AJ for additional proceedings to determine the extent of Doukas's permanent disability attributable to her compensable right-leg injury.[6]

¶14. A second hearing before the AJ was held on October 13, 2022. Having recovered from her stroke, Doukas testified. She said she was only able to wear her right-leg prosthetic "about an hour a day." Doukas's only income is from Social Security disability benefits. She said that she was unable to drive a vehicle because she could not feel the pedal and that the Carrier had not provided her with a modified vehicle. Doukas also noted that she "stopped trying [to drive], you know, because it was too complicated" and that her daughter assisted her with activities of daily living. Doukas claimed, "This injury has just disabled me totally . . . and it all is from this – it all started from [my right leg.]" She asserted that her left leg "would never have been chopped off" if her right leg had been "fitted right with a prosthetic and correctly done right."

¶15. Ty Pennington, a vocational rehabilitation counselor, also testified. He noted that two FCEs of Doukas had been conducted, one in 2018 and one in 2021. The 2021 FCE determined that Doukas was unable to (1) lift and carry; (2) carry from floor to waist; (3) carry from waist to shoulder anything over ten pounds; (4) stand-walk; (5) bend-reach without support; (6) perform low-level work (requiring kneeling or squatting); (7) perform

---

[5] One commissioner entered a dissenting opinion.

[6] Doukas appealed the Commission's order with this Court. We dismissed that appeal as it was not a final, appealable judgment. *See* Order No. 235683, No. 2020-WC-01388-COA (Miss. Ct. App. Mar. 4, 2021).

elevated or overhead work; (8) climb stairs; or (9) climb a ladder. The 2021 FCE concluded that Doukas did not demonstrate "the ability to perform a sedentary occupation on a full-time basis and it is highly unlikely she would be employable in her current condition." Thus, Pennington opined that Doukas was now totally disabled and unemployable.

¶16. The AJ entered an order on January 27, 2023, holding that based on the testimony, 2018 FCE, and medical proof, Doukas "is totally and permanently disabled due to her right lower extremity injury/amputation." The AJ further concluded that the Appellees had "not proven an independent intervening event occurred to interrupt Doukas's disability from her compensable right lower extremity injury." The AJ awarded Doukas "[p]ermanent disability benefits in an amount to be determined beginning April 6, 2016, and continuing for a period of 450 weeks," as well as "interest at the legal rate from and after the date such compensation was due."[7]

¶17. Upon petition for review, the Commission reversed the AJ's decision on October 26, 2023, with one commissioner dissenting. The Commission determined that "from September 11, 2018, the time of [Doukas's] first FCE, until April 19, 2019, the date of her non work-related left leg injury and resulting stroke, Doukas was capable of returning to some form of employment." The Commission concluded that "Doukas's compensable right leg injury did not cause her to become permanently and totally disabled; therefore, indemnity benefits are limited to the schedule found in Miss. Code Ann. § 71-3-17(c)(2)."

---

[7] The AJ held in abeyance the amount to be paid pending a joint stipulation as to average weekly wage (AWW) and compensation benefit amounts. The parties later submitted a stipulation assessing Doukas's AWW at $486.54 and a compensation rate of $324.36.

¶18. Doukas appeals the Commission's December 2020 and October 2023 decisions, arguing that the AJ's orders "regarding the compensability of the left leg and the finding of permanent and total disability [are] supported by substantial evidence."[8] As will be discussed, however, the question is not whether the AJ's orders were supported by substantial evidence, but whether substantial evidence supports the Commission's subsequent orders.

## STANDARD OF REVIEW

¶19. "The law in this State is that the Commission, not the [AJ], is the ultimate fact-finder, and this Court will apply a general deferential standard of review to the Commission's findings and decisions despite the actions of the [AJ]." *Smith v. Jackson Const. Co.*, 607 So. 2d 1119, 1123-24 (Miss. 1992). We will only reverse the MWCC's decision if it "lacks the support of substantial evidence, is arbitrary or capricious, is beyond the Commission's scope or its power, or violates constitutional or statutory rights." *West v. Nichols Center*, 369 So. 3d 110, 113 (¶17) (Miss. Ct. App. 2023). "In determining whether substantial evidence supports the Commission's decision, 'this Court serves only as a reviewing court and will not re-weigh the evidence.'" *Id*. Thus, we will not "set aside a decision that is supported by substantial credible evidence, even if conflicting evidence exists and even if this Court may have found the facts otherwise if it were the trier of facts." *Id*.

## DISCUSSION

I.  **Whether the Commission erred in reversing the AJ's June 2020 order holding that Doukas's injury to her lower left leg was related to her prior compensable work injury.**

---

[8] Doukas has not challenged the AJ's or the Commission's findings with regard to the compensability of her subsequent stroke.

¶20. Doukas argues that the Commission erred in finding that her lower left-leg injury was a non-compensable injury. She claims that there was "uncontradicted and unrefuted" testimony that her right-leg prosthetic caused her to fall and resulted in the injury and amputation of her lower left extremity. As the claimant, Doukas bore the burden "of proving by a preponderance of the evidence '(1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the claimed disability.'" *West*, 369 So. 3d at 113-14 (¶18) (quoting *Hedge v. Leggett & Platt Inc.*, 641 So. 2d 9, 13 (Miss. 1994)). "Our law requires that an injured worker must support her claim of disability with medical findings." *Myrick v. Univ. of Miss. Med. Ctr.*, 358 So. 3d 1109, 1116 (¶25) (Miss. Ct. App. 2023) (quoting *Dept. of Health/Ellisville State Sch. v. Stinson*, 988 So. 2d 933, 936 (¶10) (Miss. Ct. App. 2008)). "Medical evidence must prove not only the existence of a disability but also its causal connection to employment." *Id*. (quoting *Clark v. Spherion Corp.*, 11 So. 3d 774, 778 (¶16) (Miss. Ct. App. 2009)).

¶21. In ruling on the compensability of the left-leg injury, the AJ gave great weight to Doukas's and Morgan's testimonies, which we find were contradictory. Morgan said that she came home from school and that her mother told her about the fall, but Doukas said that she fell while moving her car on a Sunday and that Morgan was home at the time. There were also inconsistencies in the evidence regarding the timeline of her fall and the resulting injury. Doukas reported at the hospital that her left-toe injury had "been developing over several weeks" and that she had developed an "*ulcer* of her left great toe that had been present for 16 days." (Emphasis added). However, the AJ concluded that Doukas fell on April 19, only four days prior to her admission into the hospital.

10

¶22. Moreover, Doukas told One Source employees Jay Rubenstein and Keith Wade that she "stubbed" her toe; neither employee could recall that Doukas said she suffered a fall as a result of the prosthesis. Rubenstein stated in his deposition that while Doukas had a callus on her right stump due to an ill-fitting socket in January 2019, she had made no complaints about falling since getting her new foot. Wade testified that Doukas did not contact him with any complaints about her prosthesis after receiving her new socket on April 8, 2019; nor did she tell him that she fell as a result of the prosthesis. He also noted that the special shoes for people with diabetes that Doukas was allegedly wearing when she fell were designed to help prevent foot injuries. The medical records of Dr. Roach and the medical records of Memorial Hospital contain no mention of a fall or that a fall caused her toe condition. It was also noted in her hospital records (dated April 24, 2019) that Doukas stated her new prosthesis "fit her the best."

¶23. Doukas's 2019 medical records also indicate that her diabetes was uncontrolled. Her blood glucose was in the 400s, well above normal range. Dr. Lennon Bowen was deposed on October 25, 2019, as an expert in neurology and neurophysiology. He opined that "[i]t would be unusual to knock a toenail off just with a simple fall in the grass with diabetic shoes on." Dr. Bowen further asserted, "If you don't take care of yourself, your odds of having a complication like a diabetic foot infection go up expedientiably [sic]," especially when you "don't inspect your feet regularly" or "take care of your blood sugar." He noted that the orthopedic surgeon's April 25, 2019 evaluation stated that Doukas's foot had "decreased sensation secondary to diabetic neuropathy." Dr. Bowen concluded that to a reasonable degree of medical probability, Doukas's lower left-leg amputation was not attributable to her

prosthesis or the fall that she alleged occurred in April 2019. Dr. David Gandy, a board-certified orthopedic surgeon, reviewed Doukas's medical records. He explained in his November 2019 deposition that people with diabetes are at an increased risk for amputation due to neuropathy and vascular problems. Dr. Gandy specifically noted that Doukas had been advised to perform regular foot examinations, as sores can rapidly develop. He opined that the medical records did not support a finding that a fall was the cause of Doukas's left-toe injury and subsequent amputation. The Commission found the testimonies by Dr. Bowen and Dr. Gandy "more probative than the Claimant's testimony concerning the issue before the Commission."

¶24. While there is certainly evidence Doukas experienced ongoing issues with the right-leg prosthesis prior to her being fitted with the new socket on April 8, 2019,[9] there is substantial evidence from which the Commission could have determined that "the evidence as a whole" does not support a causal connection between Doukas's left-leg injury and her compensable right-leg injury. Accordingly, finding no error, we affirm the Commission's December 2020 judgment.

## II. Whether Doukas's right lower extremity injury rendered her 100% permanently and totally disabled.

¶25. On remand, the AJ concluded that Doukas's compensable right lower extremity injury rendered her "permanently and totally disabled and entitled [her] to 450 weeks of permanent

---

[9] For example, Dr. Tomajian examined Doukas on December 19, 2018, and noted that "patient is not satisfied with leg prosthesis due to bone rubbing and creating a callus that is very painful." She was referred to One Source and received a new foot for her prosthesis in January 2019.

12

disability in accordance with" section 71-3-17(a). The Commission reversed the AJ's finding, holding that "Doukas suffered a 100% industrial loss of use of her right leg and is entitled to 175 weeks of permanent partial disability benefits beginning on the date she reached [MMI] for her right leg injury." Doukas contends that this Court should reverse the Commission's October 2023 judgment and find that, "based upon the admittedly compensable right leg injury alone[, she] is permanently and totally disabled."

¶26. Upon a finding of permanent partial disability under Mississippi Code Annotated section 71-3-17(c), a claimant shall be paid for 175 weeks for loss of a leg. "Coverage under Section 71-3-17(c), including its familiar schedule, proceeds on the faith that the worker will be able to resume the same or other employment after he adapts to his disability." *Smith*, 607 So. 2d at 1128. It is only "where that injury results in a permanent loss of wage earning capacity within Section 71-3-17(a), the latter section controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in Section 71-3-17(c)'s schedule." *Id*.

¶27. In his report, Pennington determined that from September 2018 to April 2019 (before her lower left-leg injury), Doukas could have returned to the labor market performing light to partial medium sedentary work. He identified potential job openings (i.e., customer service representative or telephone operator) based on her 2018 FCE. Pennington also opined that Doukas had a wage-earning capacity of $9.00 to $12.00 per hour. Dr. Philip Blount, a board-certified physical medicine and rehabilitation physician, evaluated Doukas's records and agreed with the work restrictions as stated in the 2018 FCE, finding them "reasonable in relation to a right lower extremity below the knee amputation." Doukas

13

averred that she could not drive because of her right-leg prosthesis, and her May 2017 driving evaluation noted that she had vision issues that affected her driving ability. Yet Morgan testified that before the 2019 left-leg injury and stroke, her mother "was pretty self-sufficient" and "was able to pretty much do things on her own," although Morgan did assist Doukas with cooking and taking her medicine.

¶28. "A decision regarding the loss of wage-earning capacity is 'largely factual and is to be left to the discretion and estimate of the Commission.'" *Tew v. Siemens Power Transmission*, 156 So. 3d 329, 332 (¶10) (Miss. Ct. App. 2010) (quoting *Bryan Foods Inc. v. White*, 913 So. 2d 1003, 1010 (¶28) (Miss. Ct. App. 2005)). Based on the evidence, the Commission determined that from September 11, 2018, to April 2019, "Doukas was capable of returning to some form of employment." Finding the Commission's decision is supported by substantial evidence, we also affirm its October 2023 judgment.

¶29. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., McCARTY AND EMFINGER, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND SMITH, JJ.**

**LAWRENCE, J., DISSENTING:**

¶30. This case presents two issues on appeal. First, whether the Workers' Compensation Commission erred in its decision to deny Sabrina Doukas 450 weeks of permanent total benefits for a work-related injury to her right foot—which ultimately resulted in an amputation below the knee—and award her, instead, with 175 weeks of "loss of a scheduled member" disability benefits, asserting that she was not permanently totally disabled.

14

Doukas's right leg was amputated below the knee due to what everyone agreed was a work-related injury to her right foot. There was no dispute that the loss of the leg caused balance and walking issues that prevented her from earning any wages. Second, whether the loss of her left leg by amputation was causally related to the work-related right-leg amputation. I believe the two members of the Commission who determined both of the issues in the negative ruled contrary to the substantial evidence, resulting in an arbitrary and capricious decision. I would reverse the Commission's findings on both issues.

¶31. "The standard of review in worker's compensation cases is limited by the substantial evidence test." *McDonald v. I.C. Isaacs Newton Co.*, 879 So. 2d 486, 489 (¶11) (Miss. Ct. App. 2004) (citing *Smith v. B.C. Rogers Processors Inc.*, 743 So. 2d 997, 1002 (¶13) (Miss. Ct. App. 1999)). "This Court will not reverse the decision of the Workers' Compensation Commission unless it finds that the decision is clearly erroneous and contrary to the overwhelming weight of the evidence." *Id.* "Substantial evidence consists of sufficient evidence for reasonable minds to accept as adequate to support the Commission's conclusion." *Bowdry v. City of Tupelo*, 337 So. 3d 1158, 1163 (¶12) (Miss. Ct. App. 2022) (quoting *Sheffield v. S.J. Louis Constr. Inc.*, 285 So. 3d 614, 618 (¶8) (Miss. 2019)).

¶32. "If an administrative agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious." *Pub. Emps.' Ret. Sys. v. Marquez*, 774 So. 2d 421, 430 (¶11) (Miss. 2000). "An administrative agency's decision is arbitrary when it is not done according to reason and judgment, but depending on the will alone." *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So. 2d 973, 977 (Miss. 1999). "An action is capricious if done without reason, in a whimsical manner, implying

either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Id.*

¶33. In *Smith v. Jackson Constr. Co.*, 607 So. 2d 1119, 1128 (Miss. 1992), the supreme court held that when "an employee suffers an injury" to a scheduled member of his body, and that injury "results in a permanent loss of wage earning capacity," Mississippi Code Annotated section 71-3-17(a) dealing with permanent total disability "controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in section 71-3-17(c)'s schedule." The court further clarified that when an injured employee becomes permanently and totally disabled, the "schedule becomes irrelevant." *Id.* at 1128. Since the schedule for loss of use of a member of the employee's body "takes no account of a claimant's loss of wage earning capacity[,]" the permanent and total compensation provisions of Mississippi Annotated Code section 71-3-17(a) apply, **not** the schedule provisions of section 71-3-17(c). Here, as in *Smith*, the issue was whether Doukas was permanently and totally disabled due to the amputation of her right leg or, rather, whether she was entitled to a limited number of weeks for loss of a scheduled member.

¶34. Doukas was sixty-three years old. The Commission's findings of fact indicate the following regarding her work history:

> Before working at Kiln Self-Storage, she worked as a car rental representative, an accounts payable/receivable and car title clerk, a maid, a company runner, and a property manager. In one of her jobs, she was an administrative assistant who produced spreadsheets and advertisements for 61 hotels. At Kiln Self-Storage, where she was injured, Doukas was an office manager whose duties included renting storage units and handling accounts payable and receivable. After her April 6, 2016 injury, Doukas did not return to work for Kiln Self-Storage. Although she applied for other jobs, she was unable to obtain one.

(Emphasis added).  Doukas was unable to return to work at Kiln Self-Storage after her right leg injury because she was no longer capable of fulfilling her duties.  Doukas applied to other jobs but was not hired because her injury caused issues with her standing and stability.  For example, she testified that "the only way [she] can go to a grocery store is if they have a cart . . . [o]r if [her daughter] pushes [her] in the wheelchair."

¶35.    The Commission relied on the testimony of one witness, Ty Pennington, a vocational rehabilitation expert who was called as a witness "on behalf of the employer/carrier." Pennington testified that Doukas could work as a telephone operator and customer service representative.  However, when Pennington was confronted on cross-examination about whether Doukas's employability would be affected if she was wheelchair-bound, he responded, "[T]hat is kind of a tough question to answer."  When pressed on the issue, he admitted he did not "ask the employer" about the wheelchair when he called about potential jobs Doukas could perform.  He never explained how she could do any of those jobs when she was unable to walk and maintain her balance with a prosthetic device she could only wear for a limited amount of time.  Further, the following exchange sheds more troublesome light on Pennigton's testimony:

> Q: The functional capacity evaluation doesn't take into consideration the chronic pain that she has, medication she has to have, a wheelchair she has to have.  All they're doing is taking into effect physical requirements that they do inside of a controlled setting; isn't that correct?
>
> A: Well, I would agree with that.  But there again, as a vocational expert, it's not my role to add to that and to consider all of these other things.

¶36.    Doukas's lack of employment was **not** for a lack of discipline or for a lack of trying. A dissent written by one of the commissioners summarized what the evidence showed about

17

Doukas:

> Since early in her life, she has been constantly employed. She has held job for long periods of time, and by all accounts her employers have been pleased with her work. One reason her employers were pleased is because Doukas did not limit herself to the duties described in her job descriptions. She was willing to do whatever was needed to get the job done. Also, she worked long hours and weekends. The record shows she was a model employee. **I think the evidence shows if Doukas could have worked after her right leg amputation, she would have.**

(Emphasis added).

¶37. The administrative judge found that Doukas was permanently and totally disabled and entitled to 450 weeks of disability benefits in accordance with section 71-3-17(a). Two members of the Commission reversed that decision and decided she could work based on Pennington's testimony and held Doukas was only entitled to 175 weeks of benefits due to loss of her right leg. This holding was contrary to clear and substantial evidence. The evidence showed that Doukas could only wear the prosthetic "about an hour a day" because it caused "big blisters all over [her leg]." Her prosthetic on her "right leg has never fit[] right." The doctor "tried all kinds of ways" to fix the problem but was unsuccessful. There was also evidence that she could not drive and had difficulty walking and maintaining balance. The Commission's decision was based on the testimony of one witness, Pennington, who admitted he did not give all the relevant information about her medical problems to the different employers he called about hiring Doukas. That certainly meets the definition of "[a]n action is capricious if done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." *Miss. State Dep't of Health v. Natchez Cmty. Hosp.*, 743 So. 2d 973, 977 (¶13)

(Miss. 1999). Further, pursuant to *Smith*, if she had a member injury that caused her to be permanently and totally disabled, then she was entitled to 450 weeks if she was totally and permanently disabled. Doukas worked her whole life, but after losing her right leg to a work-related injury, she never worked again despite trying to find jobs. That is a loss of wage-earning capacity. The Commission's finding that Doukas was limited to 175 weeks of permanent partial disability benefits for the loss of a scheduled member is arbitrary and capacious and contrary to the substantial evidence and the holding of *Smith*.

¶38. Further, there was substantial evidence to prove that Doukas's left leg amputation was causally related to her work-related right-leg amputation. There is testimonial evidence that Doukas's balance was impaired due to her work-related injury. Doukas testified and her daughter confirmed that the left leg injury and ultimate amputation of that leg occurred because she lost her balance getting out of her car due to her right leg having been amputated. Thus, the left leg amputation would not have occurred but for her work-related injury to her right foot. There was substantial evidence to prove that the work-related right-leg amputation was causally related to the left leg amputation.

¶39. "When a disability develops gradually, or when it comes as the result of a succession of accidents, the insurance carrier covering the risk at the time of the most recent injury or exposure bearing a causal relation to the disability is usually liable for the entire compensation." *United Methodist Senior Servs. v. Ice*, 749 So. 2d 1227, 1230 (¶10) (Miss. Ct. App. 1999). I would reverse both of the Commission findings as to Doukas and remand for further proceedings. Accordingly, I dissent.

**WESTBROOKS, McDONALD AND SMITH, JJ., JOIN THIS OPINION.**